[Civ. No. 42202. First Dist., Div. One. May 8, 1978.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
KENNETH WAYNE TUNCH, Real Party in Interest.

**COUNSEL**

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Michael D. Whelan, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

James C. Hooley, Public Defender, and Jay B. Gaskill, Assistant Public Defender, for Real Party in Interest.

**OPINION**

**ELKINGTON, J.**—We issued an alternative writ of mandate on application of the People in order to review an order of the superior court suppressing evidence of (1) a statement made by Kenneth Wayne Tunch *and* (2) certain physical evidence, an automobile owned by him. The order was based on the superior court's determination that Tunch's *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights were violated by failure of a police officer to admonish him according to that authority prior to a *custodial interrogation.*

A fatal "felony hit-run" (see Veh. Code, § 20001) occurred late one rainy evening in the City of Oakland. The victim "appeared to have a gunshot wound in his leg and had been hit by the—vehicles." One of the police officers assigned to the case learned from an eyewitness that one of the offending vehicles was a Chrysler with license plates numbered 051 ATZ. Further investigation disclosed that the automobile had been sold to Kenneth Tunch, with two Oakland addresses given, one being 2958 Fruitvale Avenue, and whose name was familiar to the officer. Later that night a police search for the car in the general areas of Tunch's addresses was unsuccessful. Several police officers had become involved in the ongoing investigation.

At 9:20 o'clock the next morning as one of the officers "was leaving the police building," he observed Tunch walking toward the building's court entrance. The officer "told him I would like to talk to him a few minutes," and the two walked back into the building to a police interview room. We continue with testimony of the officer as given by him at the hearing on Tunch's motion to suppress:

"Q. What happened when you got into the police administration building?

"A. Mr. Tunch was inquiring about why we wanted to talk to him. I explained to him that there had been a hit and run the night before, an accident in which someone was struck with a vehicle. From the information we had, it may have been a vehicle which was registered to him.

"Q. What did Mr. Tunch say, if anything?

"A. He told me at that time that his vehicle was not drivable. He explained that, I believe, on the date of 12th of March [four days earlier], that he had been to a party, that it had been damaged, the windshield was broken. He went back the next day to get it. The driveshaft broke. He had to leave it downtown. Now, it wasn't even drivable.

"Q. Did he mention—what did you do at that time?

"A. Got the details from him about when this incident had occurred, in which he had made a report of his windshield having been broken. I went to our records division and obtained a copy of that report.

"Q. Did that report confirm the damage to Mr. Tunch's car?

"A. It did.

"Q. What did you do then, after obtaining that report?

"A. I told Mr. Tunch that we'd like to check the vehicle, check the damage that had been on that report, verify the damage, verify his story. He told us that the vehicle was at his mother's at 2958 Fruitvale Avenue, and told us to check it out."

The officer, with another, thereupon went to the already known 2958 Fruitvale Avenue address and "checked out" the vehicle in a rear garage. He found "small dents or indentations on the hood and what appeared to be a fabric burn or mark of some kind that was not immediately identifiable." He also "observed the vehicle to be wet [with] water drops

on it." His companion "started the vehicle with a key and backed the vehicle out of the driveway and drove it forward." The car's condition thus constituted evidence tending to establish that it had been involved in the hit-run occurrence. And also, contrary to Tunch's earlier statement to the officer, it appeared not only that the automobile was "drivable," but also that it had probably been driven in the rainstorm of the night before.

It will be seen that the superior court's suppression order denying the use in evidence of the vehicle, and testimony of its appearance to the police officers, forever extended to Tunch a near, if not complete, immunity from prosecution and conviction for the hit-run and possibly aggravated assault and other offenses.

Two issues are presented.

The People first contend that the *Miranda* admonition was not required for the reason that the police questioning of Tunch was not in the course of a custodial interrogation.[1]

■ It is the clear rule of this state that " 'custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived.' " (*People* v. *White* (1968) 69 Cal.2d 751, 760 [72 Cal.Rptr. 873, 446 P.2d 993]; *People* v. *Arnold, supra,* 66 Cal.2d 438, 448; *In re James M.* (1977) 72 Cal.App.3d 133, 136 [139 Cal.Rptr. 902]; Witkin, Cal. Criminal Procedure (1978 supp.) § 361F-1 (New), pp. 544-546.)

■ Equally clear is the rule that the trial court's ruling on a *Miranda* issue may not be set aside by us unless it is *"palpably erroneous."* A ruling palpably erroneous is one lacking support of substantial evidence. (*People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365].) And of course "[w]hen two or more inferences can reasonably be deduced from the facts," either deduction will be supported by substantial evidence, and "a reviewing court is without power to substitute its deductions for those of the trial court." (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].)

---

[1]The *Miranda* requirement attaches upon a "custodial interrogation" of a suspect by the police. (*Miranda* v. *Arizona, supra,* 384 U.S. 436; *People* v. *Arnold* (1967) 66 Cal.2d 438, 448-449 [58 Cal.Rptr. 115, 426 P.2d 515].)

■ Although we are of the opinion that a contrary and reasonable inference might also have been drawn from the foregoing evidence, we cannot say that the superior court's inference of a *custodial interrogation* was unreasonable. That determination was thus supported by substantial evidence, and was not palpably erroneous. It will accordingly be respected by us.

■ We advert now to the People's remaining contention. They argue that the superior court, in ruling upon Tunch's motion to suppress, failed to apply "the clearly applicable rule of inevitable discovery and thus erred in suppressing the car."

As has been pointed out, following the hit-run occurrence police officers instituted an investigation designed to locate the offending vehicle, and its operator. They had already obtained credible information of the automobile's license number, and the name and address of its owner. And the evidence reasonably indicated that had the circumstances of the *Miranda* violation not occurred, the police would have continued their investigation by examining the car with the consent of its owner, or without such consent upon issuance of a search warrant.[2]

Responding to such an argument of the People at the suppression hearing the superior court agreed, saying: "*I am sure they would have, but they didn't. They didn't, and that's all I can go on.*" (The italics, of course, are ours.)

The superior court thus made a factual determination that the police "*would have,*" in the course of a lawful investigation, discovered the here questioned evidence of the automobile. That determination is well supported by substantial evidence. Our inquiry narrows to the question whether, as a matter of law and as contended by the People, the doctrine of *inevitable discovery* became applicable.

The lineage of the doctrine will reasonably be traced to *Silverthorne Lumber Co.* v. *United States* (1920) 251 U.S. 385, 392 [64 L.Ed. 319, 321,

---

[2]We opine that a citizen eyewitness' report to the police (see *People* v. *Schulle* (1975) 51 Cal.App.3d 809, 814-815 [124 Cal.Rptr. 585]) of the license number and description of a vehicle involved in a hit-run offense, and official information as to the car's owner and his residence, would have constitutionally authorized issuance of such a search warrant. There was probable cause to believe the automobile to be in the possession of its owner in or about his residence. (See *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 96 [104 Cal.Rptr. 226, 501 P.2d 234].)

40 S.Ct. 182, 24 A.L.R. 1426], where Mr. Justice Holmes, speaking for the court, stated:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. *Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others,* but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." (The italics are ours.)

That pronouncement has frequently been reiterated by high authority. See *Wong Sun* v. *United States* (1963) 371 U.S. 471, 485 [9 L.Ed.2d 441, 453-454, 83 S.Ct. 407]; *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 169 [89 Cal.Rptr. 731, 474 P.2d 683] (cert. den., 402 U.S. 910 [28 L.Ed.2d 652, 91 S.Ct. 1387]). Elaborating, the *Wong Sun* court stated: "[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (371 U.S., p. 488 [9 L.Ed.2d, p. 455].) And more recently the court has declared: " 'Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.' " (*Brown* v. *Illinois* (1975) 422 U.S. 590, 600 [45 L.Ed.2d 416, 425, 95 S.Ct. 2254]; *United States* v. *Calandra* (1974) 414 U.S. 338, 348 [38 L.Ed.2d 561, 571, 94 S.Ct. 613].)

Commenting on the rule and explaining its rationale, the high court said in *Nardone* v. *United States* (1939) 308 U.S. 338, 340 [84 L.Ed. 307, 311, 60 S.Ct. 266]:

"Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land. In a problem such as that before us now, *two opposing concerns must be harmonized: on the one hand, the stern enforcement of the criminal law; on the other, protection of that realm of privacy left free by Constitution and laws but capable of infringement either through zeal or design.*" (Italics added.)

In harmonizing these "opposing concerns" lesser federal and state judicial authority has fashioned the *doctrine of inevitable discovery.* It has been defined in this manner:

"Although typically any evidence obtained, even indirectly, through the illegal actions of police is inadmissible as 'fruit of the poisonous tree,' where the court finds that the challenged evidence would have been eventually secured through legal means regardless of the improper official conduct, the inevitable discovery exception allows the evidence to be admitted. The doctrine was developed to prevent unjustly granting criminals immunity from prosecution." (Novikoff, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules* (1974) 74 Colum.L.Rev. 88; fns. omitted.)

The "immunity from prosecution" which often attends the suppression of evidence has long been a perplexing problem. Justice Cardozo, in *People* v. *Defore* (1926) 242 N.Y. 13 [150 N.E. 585, 587] (cert. den., 270 U.S. 657 [70 L.Ed. 784, 46 S.Ct. 353]) deplored the sometimes necessity that: "The criminal is to go free because the constable has blundered." Justice Mosk of our high court expressed a similar sentiment in *People* v. *McInnis* (1972) 6 Cal.3d 821, 826 [100 Cal.Rptr. 618, 494 P.2d 690] (cert. den., 409 U.S. 1061 [34 L.Ed.2d 513, 93 S.Ct. 562]). Professor McCormick points out that this "immunity" result "can be required by the misconduct of a single officer, thus giving each officer involved in an investigation the power to confer immunity upon the subject by acting improperly." (McCormick, Evidence (2d ed. 1972) § 166, p. 367.) And it is said that the accused subject of an unlawful search "is entitled to be as well off as if [law enforcement authority] had not unlawfully seized [evidence], but he is not entitled to be any better off." (*Lord* v. *Kelley* (D.Mass. 1963) 223 F.Supp. 684, 691 [cert. den., 379 U.S. 961 (13 L.Ed.2d 556, 85 S.Ct. 650)].)

The inevitable discovery rule now seems to have been confirmed, although by way of dicta, by the United States Supreme Court. In *Brewer* v. *Williams* (1977) 430 U.S. 387, 406-407, footnote 12 [51 L.Ed.2d 424, 441-442, 97 S.Ct. 1232], the court, as in the case before us, was concerned with an accused's illegally obtained statement which led to incriminating evidence against him at his trial. It stated: "While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, *evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been*

*discovered in any event, even had incriminating statements not been elicited from Williams.*"[3] (Italics added.)

The inevitable discovery rule has several times been applied by the reviewing courts of California.

In *People* v. *Ditson* (1962) 57 Cal.2d 415, 443-444 [20 Cal.Rptr. 165, 369 P.2d 714] (cert. dism., 372 U.S. 933 [9 L.Ed. 769, 83 S.Ct. 885]), Mr. Justice Schauer, speaking for the court, without placing express reliance upon *Silverthorne, supra,* 251 U.S. 385 or *Wong Sun, supra,* 371 U.S. 471, admonished trial courts to "exercise great care" in determining whether the " 'fruits' of the confession . . . found to be involuntary were *in fact* a product of that confession *and would not have been otherwise discovered by the police from information already in their possession or independently acquired.*" (The latter italics are ours.)

The concept was again recognized by the same court, speaking through its then Chief Justice, Roger Traynor, in *People* v. *Stoner* (1967) 65 Cal.2d 595 [55 Cal.Rptr. 897, 422 P.2d 585]. There a subject of concern was a police lineup found to be constitutionally invalid because Stoner was obliged to wear certain of his illegally seized clothing. But, relying on *Wong Sun, supra,* 371 U.S. 471, the court declared that "the prosecution could establish the admissibility of the showup identification if it could prove that whenever a victim described the culprit's clothing, the Monrovia police had all persons in the showup wear similar clothing and would have had defendant appear in glasses and clothing substantially the same as his own illegally obtained glasses and clothing had the latter not been available." (P. 603, fn. 3.)

*Lockridge* v. *Superior Court, supra,* 3 Cal.3d 166, 170, reiterated the rule in this fashion: "In accord with the foregoing principles, this court has consistently held that the testimony of a witness who was discovered by the exploitation of illegal police conduct is not admissible. . . . If, however, a witness becomes known to the police by means independent of the illegal conduct his testimony is admissible. (See *People* v. *Stoner* (1967) 65 Cal.2d 595, 602 [55 Cal.Rptr. 897, 422 P.2d 585]; *State* v. *O'Bremski* (1968) 70 Wn.2d 425, 428-430 [423 P.2d 530] (police knew

---

[3]The four dissenting justices, Burger, C. J., White, Blackmun and Rehnquist, JJ., were not in disagreement with the statement. It may reasonably be deemed to have expressed the general accord of the court. And such dicta of that high court "must be followed" (*Johnson* v. *Standard Oil Co. of New Jersey* (D.Md. 1940) 33 F.Supp. 982, 984), and are entitled to "the weight of a settled conclusion of law" (*Arrigo* v. *Commonwealth Casualty Co.* (D.Md. 1930) 41 F.2d 817, 819).

existence and identity of witness and were in fact searching for her when they illegally entered the defendant's apartment and found her).) *Moreover, even if the witness was discovered as a result of illegal police conduct, his testimony is admissible if he would have been discovered in the normal course of a lawfully conducted investigation.*" (Italics added.)

In *People* v. *McInnis, supra,* 6 Cal.3d 821, the accused had been photographed by police following his illegal arrest. The photograph was thereafter used in his identification by a witness. Responding to a contention that the identification was invalid, the court stated (p. 826): "To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are 'fruits of the poisonous tree' would not merely permit the criminal 'to go free because the constable has blundered' (Cardozo, J., in *People* v. *Defore* (1926) 242 N.Y. 13, 21 [150 N.E. 585]) but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested: . . . As declared in *United States* v. *Edmons* (2d Cir. 1970) 432 F.2d 577, 584: 'We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent custody must inevitably be excluded.' "

We find similar holdings of the state's Courts of Appeal.

*People* v. *Aylwin* (1973) 31 Cal.App.3d 826, 838 [107 Cal.Rptr. 824]. "If illegally obtained evidence would have been discovered in any event, then what was obtained unlawfully may be admitted."

*People* v. *Ramsey* (1969) 272 Cal.App.2d 302, 313 [77 Cal.Rptr. 249]. "The independent source limitation upon the fruit of the poisonous tree doctrine normally applies when the evidence derived from the unlawful conduct of the police would have been ultimately revealed by usual and commonplace police investigative procedures."

*People* v. *Chapman* (1968) 261 Cal.App.2d 149, 167 [67 Cal.Rptr. 601]. Where evidence is claimed to be the "fruit" of police illegality an inquiry will be made "whether the asserted 'fruit' was in fact a product of the statement and whether it would have been discovered through an 'independent source,' such as police investigation independent of the illegal inquiry."

*People* v. *Thomsen* (1965) 239 Cal.App.2d 84, 91 [48 Cal.Rptr. 455]. Where "[u]sual and commonplace investigatory procedures would have developed the damaging evidence that convicted defendant, quite aside from the illegal search" which first exposed it, the evidence was properly admitted.

It is of value to consider here some fair samplings of the many federal judicial statements and applications of the rule.

*Government of Virgin Islands* v. *Gereau* (3d Cir. 1974) 502 F.2d 914 (cert. den., 420 U.S. 909 [42 L.Ed.2d 839, 95 S.Ct. 829]). Following an illegally obtained "lead" from the accused, officers found and used as evidence the "murder weapon." Because of an intensive, and legal, investigative search being carried on: "[T]he police and F.B.I. agents would have found the luger without utilization of Smith's statement. We cannot say this finding is clearly erroneous and conclude that it satisfies the Government's burden to show that the luger was not the 'fruit of the poisonous tree.'" (P. 928.)

*United States* v. *Resnick* (5th Cir. 1973) 483 F.2d 354, 357 (cert. den., 414 U.S. 1008 [38 L.Ed.2d 246, 94 S.Ct. 370]). "Of course a witness' identity may be derived solely or principally from illegally obtained evidence and warrant a court in disallowing his testimony. . . . But the taint of the unlawful search may be removed if there are independently sufficient 'leads' by which the government may discover the identity."

*Gissendanner* v. *Wainwright* (5th Cir. 1973) 482 F.2d 1293, 1297. "Certainly, before any consequences so destructive of society's right to be protected from violent crimes is to be set in motion, there would have to be a respectable showing that (i) it was *solely* through such invalid source that identity was ascertained and (ii) there was no likelihood that it would have subsequently been discovered through other police efforts."

*United States* v. *Nagelberg* (2d Cir. 1970) 434 F.2d 585, 587 (cert. den., 401 U.S. 939 [28 L.Ed.2d 219, 91 S.Ct. 935]). "As to appellants' first point, it is well established that the fruit of unlawful evidence may nevertheless be admitted if the government demonstrates that the evidence would have come to its attention from an independent source. . . . Here, even if the statement obtained from Vivienne Nagelberg in Canada were properly suppressed, there existed a number of independent sources of information which would have led the government to Benichou. . . . Any taint that may have existed was therefore removed . . . ."

*James* v. *United States* (D.C.Cir. 1969) 418 F.2d 1150. A lawful, and later unlawful, entries of premises disclosed evidence of car theft, on the basis of which a search warrant was secured. The court held (p. 1152): "If the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant, apart from the tainted information, the evidence seized pursuant to the warrant is admitted."

*United States* v. *Hoffman* (7th Cir. 1967) 385 F.2d 501 (cert. den., 390 U.S. 1031 [20 L.Ed.2d 288, 88 S.Ct. 1424]). Unlawful arrests led to information about stolen money orders. But police also had adequate lawful information which would have led to investigation and the same discovery. The court held (pp. 503-504): "Certainly, the unlawful arrests did not serve to immunize the appellants from prosecution."

*Leek* v. *State of Maryland* (4th Cir. 1965) 353 F.2d 526. An unlawful search led to information of Leek's whereabouts, his arrest, and discovery of spermatozoa on his clothing, leading to his conviction of rape. Responding to a contention of a Fourth Amendment transgression, the court said (p. 528): "At most, the knowledge merely expedited the time of petitioner's arrest. The arrest was lawful since the police had reasonable grounds to believe the petitioner to be the accused party and the subsequent examination of his clothing was a reasonable and logical search growing out of the arrest."

*Killough* v. *United States* (D.C.Cir. 1964) 336 F.2d 929, 934. A homicide victim's body was located through Killough's invalid confession. The court: "The mere fact that the body was discovered at the particular time it was discovered because of Killough's disclosure of its whereabouts in his illegally secured confessions is not determinative. We cannot conclude here . . . that the body would not have been discovered 'but for' Killough's confession, having regard to the evidence here."

*Wayne* v. *United States* (D.C.Cir. 1963) 318 F.2d 205, 209 (cert. den., 375 U.S. 860 [11 L.Ed.2d 86, 84 S.Ct. 125]). "It was inevitable that, even had the police not entered appellant's apartment at the time and in the manner they did, the coroner would sooner or later have been advised by the police of the information reported by the sister, would have obtained the body, and would have conducted the post mortem examination prescribed by law. . . . Thus, the necessary causal relation between the illegal activity and the evidence sought to be excluded is lacking in this case." (Fn. omitted.)

*United States* v. *Paroutian* (2d Cir. 1962) 299 F.2d 486, 489. "Since the search was illegal, and defendant has introduced substantial evidence showing that the heroin and the letter were uncovered as a result of this illegal search, the burden shifted to the government, which then was under an obligation to prove that its evidence had an independent origin. . . . Had the government shown that it had knowledge of the secret compartment from an independent source, the evidence would of course have been admissible."

Courts of our sister states also have generally implemented the inevitable discovery doctrine. We advert again to typical authority.

*Santiago* v. *State* (Tex.Crim. 1969) 444 S.W.2d 758, 761. "Even appellant's counsel admitted that in the normal course of investigation the police would have discovered the existence of Gerchak as a witness. Under the circumstances, it is clear that the testimony of Gerchak would have been obtained regardless by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint. . . . The locating of the witness would not have remained unknown 'but for' the confession."

*Cook* v. *State* (1969) 8 Md.App. 243 [259 A.2d 326, 335]. "In the case before us we think that the evidence was sufficient for the court to find that the officer, considering the information the evidence showed he had, would have searched the car for contraband or evidence of the crimes without the statement of the appellant as to the location of the gun and that the evidence was obtained from a source independent of the illegal question."

*Duckett* v. *State* (1968) 3 Md.App. 563 [240 A.2d 332, 341]. "We deem it essential, however, to briefly express our views with respect to appellant Smith's argument that as his inculpatory statement was the source which led the police to the open field where the victim was raped, the tangible evidence there found (the victim's shoe and rent receipt, and a piece of cloth) was inadmissible under the 'fruit of the poisonous tree' doctrine. While it may be true that the officers found these items with Smith's assistance, we think their use in evidence at the retrial of the case would not be prohibited by the application of the doctrine upon which appellant Smith places reliance. Without deciding whether that doctrine is applicable in State criminal trials, we believe that the evidence would in any event have been discovered by the police without Smith's assistance since

the victim herself could have undoubtedly identified the scene of the crime."

*State* v. *Tillery* (1971) 107 Ariz. 34 [481 P.2d 271, 276] (cert. den., 404 U.S. 847 [30 L.Ed.2d 84, 92 S.Ct. 151]). Without a required *Miranda* admonition Tillery, upon his arrest, told police officers that his car was "up the road aways." A search of the vehicle on a search warrant disclosed incriminating evidence leading to his conviction. Justifying the search, the court stated: "The car had to be somewhere between the point of arrest and the scene of the crime. It was inevitable that the car would soon be found: the officers already had an accurate description of the escape vehicle and defendant had abandoned the car at the side of the highway in plain sight of passing traffic. For these reasons we hold that the trial court committed no error in allowing the state to introduce evidence seized from defendant's car under the search warrant."

*Pfeifer* v. *State* (Okla. 1969) 460 P.2d 125, 127. "To accept defendant's contention in regard to this evidence, it would be necessary to assume that but for the improper arrest the state never would have been able to discover the location of the cattle, photograph them, and locate the stock yard records. We must reject this conclusion since it seems quite apparent that even without the arrest of the defendant at that particular time and place, the state would have been able to locate the stolen cattle otherwise. There is nothing so unique about the weigh bill offered by the defendant or his admissions to the officers to indicate that this alone was the only source to the evidence which was subsequently admitted at the trial."

*People* v. *Tucker* (1969) 19 Mich.App. 320 [172 N.W.2d 712, 717] (affd. 385 Mich. 594 [189 N.W.2d 290]). " 'In our opinion, assuming an illegal confession, for the fruit of the poisoned tree doctrine to be operative, a causal chain must be shown to exist from the primary illegality to the procurement of and the effect upon the substance of the evidence sought to be employed. A bare finding that the identity of witnesses was learned by illegal means is insufficient to warrant exclusion .... [¶] Before determining the instant motion to suppress, ... [the trial court should have inquired] would the police have reasonably been expected to learn their identity by an independent investigation; ...' " (To the same effect see *People* v. *Dannic* (1968) 30 App.Div.2d 679 [292 N.Y.S.2d 257, 259].)

*People* v. *Fitzpatrick* (1973) 32 N.Y.2d 499, 506 [346 N.Y.S.2d 793, 300 N.E.2d 139] (cert. den., 414 U.S. 1033 [38 L.Ed.2d 324, 94 S.Ct. 462]). "[T]he courts have held that evidence obtained as a result of information

derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence."

*People* v. *Soto* (1967) 55 Misc.2d 219 [285 N.Y.S.2d 166, 168]. "Upon the evidence adduced at this hearing, I find as a fact that the continued search by the police would have led to a discovery of the existence and location of the knife at or shortly after 8 a.m. on May 21st. I find as a further fact that up until the time the police retrieved the knife a hot pursuit and search for such weapon was in progress, and were it not for the tainted admission of the defendant Soto, said hot pursuit and search would have resulted in its discovery by virtue of normal events and police investigation."

*People* v. *Reisman* (1971) 29 N.Y.2d 278 [327 N.Y.S.2d 342, 277 N.E.2d 396]. California police had illegally opened a package at an airport. They found marijuana, resealed the package, allowed its shipment to New York, and notified police authorities of that state. New York police intercepted the package and detected a "strong odor of marijuana." Responding to a contention that the substance should be suppressed because of the illegal California police activity, the reviewing court applied the inevitable discovery rule. "An outward inspection [by the New York police] of the marijuana carton with its telltale odor associated, by experience, with marijuana would have prompted surveillance and justified the ensuing arrest. . . . [¶] [U]ntainted information 'would have inevitably resulted.' . . ." (29 N.Y.2d, p. 284.)

There is, to be sure, contrary authority. See *United States* v. *Castellana* (5th Cir. 1974) 488 F.2d 65, 68 (mod. on other grounds (1974) 500 F.2d 325); *United States* v. *Schipani* (2d Cir. 1969) 414 F.2d 1262, 1266 (cert. den., 397 U.S. 922 [25 L.Ed.2d 102, 90 S.Ct. 902]); *United States* v. *Schipani* (E.D.N.Y. 1968) 289 F.Supp. 43, 54; *People* v. *Peacock* (1968) 29 App.Div.2d 762 [287 N.Y.S.2d 166, 168]. But such holdings are found to be at odds with the great weight of authority we have noted above.

It is urged by Tunch that without the invalid police search the evidence of his automobile would not have been *inevitably* discovered. It is true that the term does ordinarily have the connotation of "certainty," but so considered it appears to be a misnomer. Nowhere in the many definitive authorities does it appear that the police with "certainty" would have obtained the evidence "from an independent source." Instead the rule's

requirement is that it would have been discovered "in the normal course of a lawfully conducted investigation" (*Lockridge* v. *Superior Court, supra,* 3 Cal.3d 166, 170; and see *People* v. *Chapman, supra,* 261 Cal.App.2d 149, 167; *Santiago* v. *State, supra,* 444 S.W.2d 758, 761; *People* v. *Fitzpatrick, supra,* 32 N.Y.2d 499, 506), or "would have been ultimately revealed by usual and commonplace police investigative procedures" (*People* v. *Ramsey, supra,* 272 Cal.App.2d 302, 313; and see *People* v. *Thomsen, supra,* 239 Cal.App.2d 84, 91), or that "there are independently sufficient 'leads' " (*United States* v. *Resnick, supra,* 483 F.2d 354, 357), or there was a "likelihood that it would have subsequently been discovered through other police efforts" (*Gissendanner* v. *Wainwright, supra,* 482 F.2d 1293, 1297), or that the police would reasonably be expected to obtain the evidence "by an independent investigation" (*People* v. *Tucker, supra,* 172 N.W.2d 712, 717). The test is not one of certainty, but rather of a reasonably strong probability.

■ Although the inevitable discovery rule seems now firmly implanted in our law, it is with much reason said that: "Courts should be careful to prevent application of the inevitable discovery exception from subverting the safeguards of the exclusionary rule." (Schnapp, *Inevitable Discovery: The Hypothetical Independent Source Exception to the Exclusionary Rule* (1976-1977) 5 Hofstra L.Rev. 137, 155.) There is much danger that a mechanical application of the doctrine will encourage unconstitutional shortcuts. (See *United States* v. *Paroutian, supra,* 299 F.2d 486, 489.) Addressing itself to this problem the United States Supreme Court in *Michigan* v. *Tucker* (1974) 417 U.S. 433, 446-447 [41 L.Ed.2d 182, 194, 94 S.Ct. 2357], stated:

"Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose. . . . [¶] The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. *By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.*" (Italics added.)

On the same subject, the high court in *Brown* v. *Illinois, supra,* 422 U.S. 590, 604 [45 L.Ed.2d 416, 427], has said that among the factors for judicial consideration in the suppression of evidence is "the purpose and flagrancy of the official misconduct . . . ." And *United States* v. *Bacall* (9th Cir. 1971) 443 F.2d 1050, 1057 (cert. den., 404 U.S. 1004 [30 L.Ed.2d 557, 92 S.Ct. 565]), says: " '[W]here that conduct is particularly offensive the deterrence ought to be greater and, therefore, the scope of exclusion broader.' " Accordingly, the question whether evidence should be suppressed under *Silverthorne, supra,* 251 U.S. 385 and *Wong Sun, supra,* 371 U.S. 471—"must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on . . . a talismanic test." (*Brown* v. *Illinois, supra,* 422 U.S. 590, 603 [45 L.Ed.2d 416, 427].)

These standards, we opine, conscientiously applied by our trial courts, will adequately safeguard the purposes of the exclusionary rule as stated in *Silverthorne* and *Wong Sun.*

 Another protection against abuse of the inevitable discovery rule is the law's mandate that when it appears that evidence has been unlawfully acquired, the heavy burden of establishing its admissibility under the rule rests upon the prosecution. (See *Brown* v. *Illinois, supra,* 422 U.S. 590, 604 [45 L.Ed.2d 416, 427]; *Nardone* v. *United States, supra,* 308 U.S. 338, 341 [84 L.Ed. 307, 311-312]; *United States* v. *Falley,* 489 F.2d 33, 41.) And trial courts will necessarily have broad discretion, on the facts and circumstances of each case, in applying or withholding application of the rule.

 It seems well to emphasize that the inevitable discovery rule will apply *only* to evidence that would probably have been discovered even had the claimed illegality not occurred. The case before us is a good illustration. Tunch's false, or mistaken, statement to the police officer that his car was inoperable must of course be suppressed. So also must the officer's observation of raindrops indicating the vehicle's recent use, for there is little probability that when the police otherwise got around to a legal investigation of the car the moisture would still be there. But otherwise the evidence adduced at the suppression hearing, depending on the superior court's view of and inferences drawn from it, would support a conclusion that the vehicle itself, with its physical indications of a recent collision with a human being, was not a "fruit" of the unlawful search.

As we have pointed out, the superior court, on substantial evidence, concluded that in their ongoing investigation the police *surely* "would have" legally found and observed Tunch's automobile. But declining to apply the inevitable discovery rule, the court made no inquiry into the "good faith" (see *Michigan* v. *Tucker, supra,* 417 U.S. 433, 447 [41 L.Ed.2d 182, 194]), or the "purpose and flagrancy" (see *Brown* v. *Illinois, supra,* 422 U.S. 590, 604 [45 L.Ed.2d 416, 427]), of the criticized police conduct. We conclude that it would serve the interest of justice to remand the cause to the superior court for such an inquiry.

We accordingly hold that the order suppressing evidence is valid insofar as it relates (1) to statements, declarations or admissions of Tunch to the police prior to any *Miranda* admonition, and (2) to the police observation of "water drops" upon Tunch's automobile. The cause will be remanded to the superior court for further proceedings and determination, in accordance with the views we have expressed, whether the doctrine of inevitable discovery is otherwise applicable on the facts and circumstances of the case.

The peremptory writ of mandate will issue accordingly.

Racanelli, P. J., and Draper, J.,* concurred.

A petition for a rehearing was denied June 7, 1978, and the petition of the real party in interest for a hearing by the Supreme Court was denied July 5, 1978. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.