[Crim. No. 16090. Fourth Dist., Div. Two. Jan. 18, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
PEDRO VESCARA JAQUEZ, Defendant and Appellant.

922

COUNSEL

Minkin & Kohn, Ron Minkin and David E. Osterloh for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Frederick R. Millar, Jr., Keith I. Motley and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUFMAN, Acting P. J.—His motion to suppress assertedly illegally obtained evidence having been denied, pursuant to a plea bargain defendant entered pleas of guilty to two counts of a four-count information and the

other counts were dismissed. Defendant appeals pursuant to Penal Code section 1538.5, subdivision (m), to have reviewed the order denying his suppression motion.

Multiple searches and seizures were involved. We conclude that one was unlawful but the others were not, and under compulsion of *People* v. *Hill* (1974) 12 Cal.3d 731, 767-770 [117 Cal.Rptr. 393, 528 P.2d 1], we conditionally reverse the judgment of conviction with directions to the trial court to reinstate the dismissed charges and proceed to trial.

The information was in four counts. The first count charged concealing stolen property in violation of Penal Code section 496 on or about March 12, 1983. The second count charged possession for sale of a controlled substance (heroin) on or about March 12, 1983, in violation of Health and Safety Code section 11351. Count 3 charged another violation of Health and Safety Code section 11351 on or about March 12, 1983, possession for sale of a controlled substance (cocaine). Count 4 charged that on or about March 15, 1983, defendant again violated Health and Safety Code section 11351 by possessing for sale a controlled substance (heroin). Pursuant to the plea bargain defendant pled guilty to counts 1 and 3 and counts 2 and 4 were dismissed. Defendant was sentenced to state prison for the midterm of three years on count 3 (possessing cocaine for sale). On count 1 (concealing stolen property) he was sentenced to the midterm of two years to run concurrently with the sentence on count 3.

*Facts*

Maria Van Buren was a real estate agent in San Bernardino. On March 12, 1983, she was to show some clients, Mr. and Mrs. Martin, a house located at 2558 West Atchison Street in San Bernardino. The house was listed in a multiple listing book, and could be shown by any realtor. A key to the house was in a multiple listing lockbox on the front door. The multiple listing book stated the house was occupied by tenants. No name was listed but a telephone number was, so Van Buren attempted to call before going to the house. A telephone recording said the number was no longer in service. So Van Buren took her customers to view the house.

When Van Buren and her clients arrived at the house, Van Buren went up to the door, knocked and rang the bell but received no response, so she took the key from the multiple listing lockbox and opened the door. As she opened the door, she called out, " 'Hello. Real estate.' " There was no one there. Van Buren and her clients entered the house.

There was a television and a radio in the front room, but otherwise the house was completely bare of furniture. Van Buren's clients opened cup-

boards and looked in the pantry. There was a stereo and turntable in the pantry, and another stereo and more stereo components in the cabinet under the sink in the kitchen. The clients went into the bedrooms and looked in the closets. There was another stereo and some other items in one of the closets, some rifles and a turntable in another closet, and a stereo, tape recorder, turntable, and other components in the linen closet. There were also various television sets in the closets and cupboards. There was no access into the garage from the house and neither Van Buren nor either of the Martins entered the garage.

Because of the large amount of stereo equipment and the number of televisions found in the house, Van Buren and the Martins became suspicious the property might be stolen. They left the house and went to a nearby convenience market from which Van Buren telephoned the police. She related to them what had transpired, what she had seen and her suspicions about the property being stolen. The police asked her if she would meet them at the house and she agreed to do so.

Van Buren and the Martins returned to the house to await the police. Van Buren testified at one point that when she went back to the house to wait for the police she believed the house was "vacant." Later on cross-examination she testified that even before she showed the house to the Martins she felt it was unoccupied because the phone service had been disconnected.

Officer Carr of the San Bernardino Police Department was dispatched to the house at 2558 West Atchison Street to investigate. Van Buren and the Martins met him outside the house. Van Buren told Carr she had just shown the house to the Martins. She told him the house was listed as occupied according to her realty book, but that no one answered when she knocked, so she had used the lockbox key to go inside with her customers, and they found a lot of stereos and televisions inside but no furniture. Van Buren showed Officer Carr her listing book, which indicated the house was occupied. Officer Carr testified Van Buren told him it appeared the people had either moved out or were in the process of moving out at that time.

Van Buren then opened the door using the lockbox key and permitted Officer Carr to enter the residence. Inside the house, Officer Carr looked in all the cupboards and closets. He found stereo equipment, televisions, television converter boxes and other items in the pantry. There were other stereo component items under the sink. There were televisions and stereo components in a large cabinet. In the kitchen Officer Carr found a large box filled with what at first appeared to be trash, but on closer examination turned out to be tape-wrapped foil cylinders and some heat-sealed plastic containers. Stereo components were found in the linen closet, a gram scale

in the bathroom, three televisions, a shotgun and a rifle in a closet, and another television, television decoder boxes and another rifle in another bedroom closet. Neither rifle was loaded.

Officer Carr called the police property truck. He and other officers took possession of all the items found on the premises, inventoried the items, loaded them onto the property truck, and took them to the police station. At the police station, Officer Carr examined the contents of the large box, including the wrapped cylinders and sealed plastic containers. Subsequent chemical analyses of the packages inside the box demonstrated they contained sizable quantities of cocaine and marijuana.

Apparently before the property was inventoried and removed Officer Carr also inquired of the neighbors about the occupants of the house. The neighbors said the apparent tenants were two young male Mexicans, who came and went only during the evening hours. The tenants had not been seen for two days. Other than these nocturnal visits, the residence appeared vacant. Carr was also told that one of the two occupants had been seen driving a purple-over-green Plymouth and the other a white Ford Thunderbird.

Three days later, on March 15, 1983, Officer Mallek was on patrol in the area when he received a radio transmission stating that an anonymous informant had reported two males of Mexican ancestry were inside the residence at 2558 West Atchison Street. Mallek was the officer in whose beat the house was; Officer Carr had told him that large amounts of suspected stolen property and drugs had been found in the house on March 12, and Mallek had been keeping an eye on the house off and on while on patrol.

A few minutes after the first radio report Mallek received a second advising him the informant now reported the two male Mexicans had left the Atchison Street house in a purple-over-green car. Twenty to thirty seconds later Mallek spotted the purple-over-green car approximately two blocks away from the residence. Two male Mexicans, one of whom was defendant, were inside the car. Defendant was driving. Officer Mallek stopped the car using his red light. He asked for identification and defendant produced a driver's license with a Riverside address. The officer asked defendant whether that was his correct address and defendant stated it was not, that he had been living at the 2558 Atchison address for a period of about two months. The officer asked defendant if he had keys to the Atchison Street house and defendant said he did. Without being requested to do so, defendant handed a key to the officer.

Officer Mallek noticed through a window of the car a car stereo lying loose in the rear portion of the Plymouth. He told defendant he did not have

to do so but that he, Officer Mallek, would appreciate it if defendant would accompany him back to the Atchison Street house. Defendant agreed to do so and he and his companion drove back to the house in the purple-over-green Plymouth while Officer Mallek drove back in his police unit.

When the three arrived back at the Atchison Street house they got out of their respective cars and Officer Mallek asked defendant if he could look through the house. Defendant said, " 'Go ahead.' " The officer then noticed that the garage was unattached to the house so that there was no entrance from the house into the garage and he asked defendant if he had a key to the padlock on the overhead door of the garage. In response, defendant handed Mallek the key and Mallek opened up the garage door. Inside the garage Mallek saw a red-over-light blue Ford Thunderbird and against the east wall, a large guitar amplifier, a stereo console unit and a guitar power amplifier.

Then, using the house key defendant had given him, Officer Mallek entered the residence through the front door. He looked through the house and found nothing. He then went back outside where defendant was standing with another officer and asked defendant whose Thunderbird was in the garage. Defendant indicated it was his cousin's car and that defendant occasionally used it. Officer Mallek had noticed a Ford key on defendant's key ring and asked defendant if he minded if he looked through the Thunderbird including the trunk. Defendant said it would be fine with him and gave the officer a key to the vehicle.

Mallek went to the vehicle and looked through the passenger portion, finding nothing. Then, using the key defendant had given him, he opened the trunk of the vehicle. In the opened trunk he saw a 13-inch Zenith color television set, a tool box, two radio headphone sets, a plastic socket wrench set and some coffee jars and other receptacles containing a white powdery substance. Based on his experience and training the officer suspected the white powdery substance was a narcotic and he called a detective from the narcotics division to the scene. Detective Aragon responded. He field-tested some of the powdery substance and concluded that some of it was probably heroin and some of it was probably cocaine. Subsequent chemical analyses proved there were indeed substantial quantities of both drugs. A quantity of marijuana was also found in the trunk.

The property was seized and defendant was arrested.

Defendant moved to suppress as evidence all the property found and seized at the Atchison Street house on March 12 and all the property found and seized by the police on March 15. The motion was submitted on the

transcript of the preliminary hearing plus points and authorities. In due course the motion was denied.[1]

### Contentions, Issues and Discussion

On appeal defendant contends that the search of the house by the police on March 12 was unlawful because the real estate agent could not lawfully authorize it; that even if the search could be said to have been proper, the warrantless seizure of the property was unlawful; that the property discovered and seized on March 15 was the fruit of the unlawful search and seizure on March 12 and that even if it was not, Officer Mallek lacked cause to make the vehicle stop of the purple-over-green Plymouth and that all that was found and seized from the garage and the trunk of the Thunderbird was the product of that unlawful auto stop. The People contend the real estate agent could lawfully authorize the search, and the seizure of the property was not unlawful because the property appeared to be abandoned, but that in any event the searches of the garage and the trunk of the Thunderbird on March 15 were consented to by defendant and did not constitute fruit of the search and seizure on the 12th even if the search and seizure on the 12th were unlawful.

### 1. *The Initial Search and Seizure on March 12, 1983*

 The People assert the search was valid because it was made pursuant to the consent of a person Officer Carr reasonably and in good faith believed had the authority to give valid consent and that the property was properly seized because it was abandoned or at least the officer reasonably believed it was abandoned. We agree with defendant the real estate agent lacked authority to consent to the search and, a fortiori, to the seizure. Although that conclusion would not necessarily preclude the officer's reasonable, good faith belief the real estate agent had authority to consent to the search, we cannot agree with the People that any such belief was reasonable in view of the circumstances known to the officer, nor can we agree that the property was abandoned or reasonably thought to be abandoned. We therefore conclude the search and seizure at the Atchison Street house on March 12, 1983, was unlawful.

 In support of his contention the real estate agent, Ms. Van Buren, could not validly consent to Officer Carr's entry and search of the Atchison Street house, defendant cites *People* v. *De Caro* (1981) 123 Cal.App.3d

---

[1]The order denying defendant's motion read: "Maria Van Buren reasonably believed the premises were vacated. [Citation omitted.] Thus, she had the right to call the police in and give them permission to search. Motion denied."

454 [176 Cal.Rptr. 509]. In *De Caro* the defendant's home had been listed for sale with a multiple listing service. A police informant posed as a prospective buyer and entered the home accompanied by the real estate agent, who was not aware of the informant's true purpose. The observations of the informant were used, with other information, to establish probable cause for the issuance of a search warrant. The warrant was issued, the items were seized, and the defendant was convicted of insurance fraud. The Court of Appeal affirmed the conviction because it found sufficient information to supply probable cause for issuance of the warrant otherwise. However, it held that the information supplied by the police informant must be excised, stating: "By the multiple listing of his home for sale, De Caro's consent to entry and any implied invitation extended only for the limited and specific purpose of permitting the entry of a real estate agent accompanied by bona fide potential purchasers of the home. De Caro had a reasonable expectation that absent compulsion by legal process, his home would not be entered by an agent of the police [citations]. . . . The People's contention also overlooks this state's well established line of authorities that condemn unlawful entries by a ruse or trick [citations]." (*People* v. *De Caro, supra,* 123 Cal.App.3d 454, 466.)

To the extent the *De Caro* court indicated the authority of a real estate agent to consent to entry by others is limited to actual bona fide potential purchasers of the property, we disagree with it. A real estate agent's authority to consent to an entry is not vitiated by some secret, deceptive intent harbored in the mind of the person posing as a potential buyer. In substance, *De Caro* is simply a case involving an impermissible subterfuge by the police. (See also *In re Robert T.* (1970) 8 Cal.App.3d 990 [88 Cal.Rptr. 37] [apartment manager introduced an officer to the tenant as "my friend Joe." Observations of the officer inside the apartment would not support a search warrant.].) It was unnecessary for the court to address the issue of the real estate agent's authority to permit entry by someone who unbeknown to the agent was not in fact a bona fide potential purchaser of the property.

However, we do agree with the *De Caro* court that the authority of a real estate agent to authorize entry to a house listed for sale is limited. It is limited, as is all consensual authority, by the terms of the consent and the purpose for which it was given. (See *People* v. *Harwood* (1977) 74 Cal.App.3d 460, 466-467 [141 Cal.Rptr. 519]; *People* v. *Superior Court (Arketa)* (1970) 10 Cal.App.3d 122, 127 [89 Cal.Rptr. 316].) A real estate agent is authorized to consent to the entry of persons the agent believes in good faith to be potential purchasers of the property. Here, of course, Officer Carr was not such a person nor did Ms. Van Buren believe that he was. She knew full well he was a policeman responding to her telephone call to the police.

Of course, Ms. Van Buren and her clients, Mr. and Mrs. Martin, had the right to enter the house in the first place and to open the cupboards and closets and see what they saw. However, this is a fact we shall discuss in connection with the validity of the searches and seizures on March 15.

██ The conclusion that the real estate agent could not in fact lawfully consent to Officer Carr's entry and search of the residence would not preclude a finding that the officer reasonably and in good faith believed the agent had the authority to consent to his entry and search and if that were the case they would not be unlawful. (See, e.g., *People* v. *Hill* (1968) 69 Cal.2d 550, 554-555 [72 Cal.Rptr. 641, 446 P.2d 521]; *De Conti* v. *Superior Court* (1971) 18 Cal.App.3d 907, 910 [96 Cal.Rptr. 287].) However, under the circumstances disclosed here, it cannot be concluded the officer could reasonably entertain such a belief. He knew all of the circumstances including the fact that the only authority Ms. Van Buren had to permit anyone into the property derived from her status as a real estate agent attempting to sell a house listed for sale with the multiple listing service. She was not the listing broker and inferentially had never met either the owner or the tenants and had never shown the house before. The officer was shown the listing which indicated it was occupied by a tenant. And although Ms. Van Buren testified she had concluded the property was "vacant," Officer Carr testified Ms. Van Buren had told him it appeared the people had either moved out or were in the process of moving out. While policemen are not required to be experts in the law of landlord and tenant, we do not believe an experienced policeman could reasonably believe a multiple listing broker or agent is authorized to permit entry and inspection by anyone known to the agent or broker not to be interested in the purchase of the property.

██ Even were it otherwise, however, the warrantless seizure of the property cannot be justified on any theory. Even if the evidence would reasonably support a conclusion the property had been abandoned, obviously the real estate agent could not consent to its seizure by the police. Under proper circumstances, conceivably the owner of the house might (see *People* v. *Urfer* (1969) 274 Cal.App.2d 307, 310 [79 Cal.Rptr. 60]), but the owner was never contacted. Moreover, there is no substantial evidence the property was either abandoned or that the officer reasonably believed it was abandoned. Officer Carr did not testify he believed the property was abandoned. As previously indicated, the only testimony material to the point given by Officer Carr was that Ms. Van Buren had told him it appeared the people had either moved out or were in the process of moving out at that time. Moreover, before the property was actually seized and transported to the police station Officer Carr had interviewed several neighboring residents and had learned that there were in fact apparent tenants who were rarely

seen except at night and that they had been seen at the house as recently as two nights before.

Finally, no exigent circumstances existed that would justify a seizure of the property without a warrant.

For the foregoing reasons we conclude the search and seizure at the Atchison Street house on March 12, 1983, were unlawful.

## 2. The Vehicle Stop and Searches and Seizures on March 15, 1983

■ Defendant is of course correct that evidence which the police have discovered by exploitation of an unlawful search and seizure is itself subject to suppression under the exclusionary rule. (E.g., *People* v. *Johnson* (1969) 70 Cal.2d 541, 549 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 767-768 [44 Cal.Rptr. 313, 401 P.2d 921].) However, "[n]ot 'all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police.' (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455].) Rather, the appropriate test is ' "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 488 [9 L.Ed.2d at p. 455]; *People* v. *Johnson* (1969) 70 Cal.2d 541, 546 [75 Cal.Rptr. 401, 450 P.2d 865]; *People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321].)" (*Mann* v. *Superior Court* (1970) 3 Cal.3d 1, 8 [88 Cal.Rptr. 380, 472 P.2d 468].)

■ The People contend, and we agree, that the evidence discovered and seized by the police on March 15, 1983, was not come at by exploitation of the initial illegal search and seizure but, rather, was lawfully come at by the police, the taint of the initial illegal search and seizure having been fully dissipated by defendant's free and voluntary consent to the search of the garage and the search of the trunk of the Thunderbird. ■ We also observe that the searches and seizures on March 15 were valid under the inevitable discovery rule.

■ To facilitate the discussion we start with inevitable discovery. The rule excluding evidence obtained in violation of the constitutional prohibitions of unreasonable searches and seizures "does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . . ." (*Silverthorne Lumber Co.* v. *United States* (1920) 251 U.S. 385,

392 [64 L.Ed. 319, 321, 40 S.Ct. 182, 24 A.L.R. 1426], overruled on other grounds in *United States* v. *Havens* (1980) 446 U.S. 620 [64 L.Ed.2d 559, 100 S.Ct. 1912]; see also *Nix* v. *Williams* (1984) — U.S. —, — [81 L.Ed.2d 377, 386, 104 S.Ct. 2501].) ▮ "'Although typically any evidence obtained, even indirectly, through the illegal actions of police is inadmissible as "fruit of the poisonous tree," where the court finds that the challenged evidence would have been eventually secured through legal means regardless of the improper official conduct, the inevitable discovery exception allows the evidence to be admitted. The doctrine was developed to prevent unjustly granting criminals immunity from prosecution.' (Novikoff, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules* (1974) 74 Colum.L.Rev. 88; fns. omitted.)" (*People* v. *Superior Court* (*Tunch*) (1978) 80 Cal.App.3d 665, 673 [145 Cal.Rptr. 795].)

▮ Here, the automobile stop and the events that followed on March 15, 1983, would have occurred just as they did even had there been no illegal search and seizure on March 12. The key to this conclusion is that pursuant to the multiple listing and Ms. Van Buren's status as a real estate agent authorized to show the property, Ms. Van Buren and the Martins had every right to enter the Atchison Street house, to open the closets and cupboards in the process of inspecting the house, to see what they saw, to form the suspicions they did, and to report those things to the police. Thus, the police properly and lawfully were informed that the house was full of what was reasonably suspected to be stolen property. In addition, Officer Carr was fully authorized to investigate and in the course of that investigation to interview the several neighboring residents as he did and to learn that the apparent tenants were two males of Mexican ancestry who came and went usually at night and that they had not been seen by the neighbors for the last two days.

Having all this information strongly indicating the house was full of stolen property, the police unquestionably would have desired to talk to the apparent tenants. Indeed, Officer Mallek indicated that he had been keeping an eye on the house off and on during his patrolling. When the police received the report that two male Mexicans were presently in the house, there can be no question but that they would have transmitted the information to Officer Mallek just as was done so that he could go to the house to investigate the men's relationship to the house and to the large quantity of suspected stolen property inside. When the police received the second report that the two men had left the house in a purple-over-green automobile that information would doubtlessly have been transmitted to Officer Mallek also, just as it was. Officer Mallek would have stopped the vehicle just as he did and all of the things that ensued would have occurred just as they did. Officer Mallek said not one word to defendant or his companion about the

previous police activity, nor is there anything whatever in the record to suggest either man knew of the illegal search and seizure on March 12. Most likely, if they were in the house as was reported, they knew property was missing, but there is nothing whatever in the record to indicate they knew the police had removed it.

Thus, the case would appear to be a classic one of inevitable discovery.

■ We observe in passing that the automobile stop was fully justified under the principles of *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]. Officer Mallek was aware of specific and articulable facts causing him to suspect that some activity relating to crime had taken place: he knew that three days earlier on March 12 the Atchison Street house was full of suspectedly stolen television sets, stereo equipment and other personal property. There were specific and articulable facts indicating the persons he intended to stop were involved in that activity: the two men in the purple-over-green automobile had reportedly been inside the Atchison Street house only moments before and then were reported to have left in that rather distinctively colored car. While the relationship between the men, the house and the suspected stolen property was not known, the facts known to the officer were such as to indicate or even require that an investigative stop should be made. It is also true that the police informant was not identified. However, the informant was apparently a "citizen" informant and in any event the question is not whether there was probable cause to support an arrest at that point but only whether there were articulable facts justifying a suspicion the men in the car had something to do with the house and, thus, the suspected stolen property. Manifestly, there were.

■ We turn finally to attenuation of the initial illegality by virtue of defendant's free and voluntary consent to the search of the garage and the Thunderbird. We have set out the facts concerning Officer Mallek's encounter with defendant and his companion at some length and will not repeat them. Suffice it to say the record fully supports the trial court's implied findings that defendant freely and voluntarily consented to both the search of the garage and the search of the Thunderbird including its trunk.[2] Officer Mallek had asked whether he could look through the house and defendant had said he could and had given him a key. When Officer Mallek saw there was no entrance to the garage from the house and asked defendant if he had a key to the garage, defendant again handed him the key. He did not affirmatively state that he consented to the search of the garage, but his actions

---

[2]The magistrate expressly so found. The trial court's findings are implied in its denial of the motion to suppress. (Evid. Code, § 402, subd. (c); *People* v. *West* (1970) 3 Cal.3d 595, 602 [91 Cal.Rptr. 385, 477 P.2d 409].)

implied that he was giving consent (see *People* v. *Harrington* (1970) 2 Cal.3d 991, 995 [88 Cal.Rptr. 161, 471 P.2d 961]), and the trial court impliedly so found. (See fn. 2, *ante.*) Defendant's consent to the search of the trunk of the Thunderbird was clear both from his words and his conduct in handing Officer Mallek the key to the automobile's trunk.

 "That degree of 'attenuation' which suffices to remove the taint from evidence obtained directly as a result of unlawful police conduct requires at least an intervening independent act by the defendant or a third party which breaks the causal chain linking the illegality and evidence in such a way that the evidence is not in fact obtained 'by exploitation of that illegality.' *Consent by the defendant, if 'sufficiently an act of free will to purge the primary taint of the unlawful* [arrest]' (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 486 [9 L.Ed.2d 454]), *may produce the requisite degree of 'attenuation.'*" (*People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321], italics added; accord *Mann* v. *Superior Court, supra,* 3 Cal.3d 1, 8; *People* v. *Pranke* (1970) 12 Cal.App.3d 935, 946 [91 Cal.Rptr. 129].) In the case at bench there is no evidence or indication of any kind that defendant's consent to the search of the garage and the search of the trunk of the Thunderbird were induced or in any way influenced by the unlawful search and seizure on March 12. In fact, as previously observed, there is no evidence or indication that defendant even knew of the earlier unlawful search and seizure.

### Disposition

The evidence found in and seized from the garage and the trunk of the Thunderbird would fully support the charges of which defendant pleaded guilty, possession of cocaine for sale and concealing stolen property. However, in both counts as to which defendant pleaded guilty, it was alleged that the offense occurred on or about March 12, 1983, whereas count 4 which was dismissed alleged the offense occurred on or about March 15, 1983. Accordingly, we are compelled by stare decisis to apply the rule laid down by the California Supreme Court in *People* v. *Hill, supra,* 12 Cal.3d 731, 767-770 (overruled on other grounds in *People* v. *De Vaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872]), and to reverse the judgment of conviction. However, in view of the fact that the evidence lawfully obtained would amply support the charges of which defendant pleaded guilty, it may be that defendant will decide not to withdraw his plea of guilty after all. We shall therefore reverse the judgment conditionally.

On condition that within 60 days of the finality of this decision defendant files a motion in the San Bernardino Superior Court to withdraw his plea of

guilty and substitute therefor a plea of not guilty, the judgment is reversed with directions to the trial court to grant said motion, reinstate the dismissed counts of the information and proceed to trial as provided by law. In the event defendant does not file a motion to withdraw his guilty plea and substitute a not guilty plea therefor within the prescribed time, the error of the trial court in wholly denying defendant's suppression motion shall be deemed nonprejudicial and the judgment of conviction shall stand affirmed.

McDaniel, J., and Rickles, J., concurred.