[Crim. No. 35011. Second Dist., Div. One. Nov. 10, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID WENDELL RUGGLES, Defendant and Appellant.

Counsel

Paul W. Grace, under appointment by the Court of Appeal, Yagman & Yagman and Stephen Yagman for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders, Penina S. Van Gelder and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**DALSIMER, J.**—David Wendell Ruggles (defendant) appeals his conviction after a guilty plea on one count of robbery with the use of a firearm in the commission of the offense.

### Procedural History

Defendant was charged with (1) robbery (Pen. Code, § 211) and the use of a firearm in the commission of the offense (Pen. Code, § 12022.5) and (2) possession of a firearm by an ex-felon (Pen. Code, § 12021). The information was subsequently amended to charge six prior convictions, and thereafter the case was consolidated with a second case in which a single count of robbery (Pen. Code, § 211) was charged. Defendant pled not guilty to the charges, denied the priors, and moved to suppress evidence pursuant to section 1538.5 of the Penal Code. A hearing on the section 1538.5 motion ensued, and, following denial of that motion by the trial court, defendant, pursuant to a negotiated plea, withdrew his not guilty plea and entered a plea of guilty to count I (robbery), admitted the use allegation charged under section 12022.5, and also admitted three of the six prior convictions.

Defendant then appealed the denial of his section 1538.5 motion and the judgment of conviction. This court on June 16, 1980, filed its unpublished opinion wherein we ruled that the section 1538.5 motion to suppress was properly denied and affirmed the conviction. On August 13, 1980, the California Supreme Court denied defendant's petition for a hearing. On November 6, 1980, defendant filed a petition for a writ of certiorari with the United States Supreme Court.

Defendant's petition presented to the Supreme Court a single ques-

tion: "Was the warrantless search of petitioner's briefcase, while he was under the exclusive control of the police, invalid, thereby necessitating the granting of petitioner's motion to suppress?"

On July 2, 1981, the United States Supreme Court granted defendant's petition and the clerk of the court advised this court, "[T]he judgment of the Court of Appeal in this cause is vacated, and ... this cause is remanded to the Court of Appeal of California, Second Appellate District, for further consideration in light of *Robbins* v. *California* [(1981) 453 U.S. 420]."

## FACTS

In November 1978 Sergeant Morosky of the Los Angeles Police Department, intelligence division, received information that defendant had participated in several armed robberies in the City of Los Angeles. The sergeant communicated this information to Officer Robert G. McSeveney of the robbery-homicide division of the Los Angeles Police Department. McSeveney was also informed that defendant was a parolee, had been in prison for armed robbery, and was living in San Pedro. He was given a physical description of the defendant, and he obtained verification of defendant's description and criminal record from the records and identification division of the department. Morosky indicated to McSeveney that defendant had been involved in a recent motel robbery in which he had been accompanied by a male Latin, that during the commission of the robbery defendant had been armed and had handcuffed the victim, and that defendant drove a black over red Mercury Montego automobile. It was learned by McSeveney that defendant had been seen in the locale of the Nutel Motel and that he posed as a law enforcement officer. During the Nutel Motel robbery the victim had been shown a badge and told that the robber was an agent of the state narcotics department or of the Department of Justice.

After making a showup card with a photograph of the defendant, McSeveney displayed that card to the victim of the robbery and to two female employees of the motel. Mr. Carragher, the victim, stated that the person in the photograph strongly resembled the man who had robbed him.

From the information received by McSeveney concerning the Nutel robbery, he concluded that the description of the robber coincided with that of the defendant, that the defendant was the robber, and that he

had probable cause to arrest defendant. In spite of these conclusions no attempt was made to arrest the defendant because the officers hoped that by placing him under surveillance they would be able to effectuate the arrest of the accomplice as well. A surveillance of defendant and his residence was instituted.

On January 2, 1979, Sergeant Morosky told Officer McSeveney and his partner, Sergeant Stein, that he had information that the defendant was going to commit a major robbery and that there would be another suspect in the robbery. He informed them that the defendant was to meet the other person at 8 o'clock in the morning of January 3, 1979, on Reseda Boulevard near the Ventura Freeway in the San Fernando Valley and that the two of them would rob a jewelry store in Santa Barbara. Morosky said that his informant had indicated that two hand-guns would be used and that defendant normally carried one of the weapons on the small of his back and probably would have the second weapon in a briefcase or a satchel. McSeveney contacted the surveillance team and informed them that the defendant was armed and dangerous. They were made privy to all of the information related above and instructed to stop and arrest the defendant should he appear to be leaving the County of Los Angeles.

On the morning of January 3, Officer Brooks of the Los Angeles Police Department, a member of the surveillance team, set up a surveillance in the area of Reseda Boulevard and the Ventura Freeway as instructed. In addition to Officer Brooks, there were ten other officers, five or six police vehicles, and a helicopter employed in the surveillance. Brooks and his partner, Sergeant Hagele, took their positions at 7 a.m. and commenced communications by radio with other surveillance team members.

Observing the defendant's automobile, Brooks watched defendant drive to a location on the north side of Irwin just east of Reseda Boulevard. Brooks watched defendant park and leave the automobile. Defendant was continuously looking back and forth, up and down the street, and from side to side. He then went to the rear of the vehicle, opened the trunk, removed a brown briefcase, and, continuing to make careful observations of the area, entered an apartment building complex.

Approximately 10 to 15 minutes later defendant returned to the car, again looking up and down the street, and opened the trunk, replacing

the brown briefcase therein. He then drove to the Ventura Freeway and entered proceeding westbound to the area of Chesebar. The surveillance team decided that defendant was about to leave the county, whereupon they stopped him. A black and white police unit displayed a red light, and defendant parked his vehicle on the shoulder in the center of the freeway. Defendant immediately emerged from the car, and Officer Brooks and other officers approached, displaying three or four handguns and at least one shotgun, all of which were pointed at the defendant. Complying with instructions, defendant lay prone on the center divider, where he was handcuffed, patted down, and informed that he was under arrest. He was then stood up against the center divider fence. By this time at least five or six police vehicles and approximately ten to twelve officers had gathered.

Brooks looked into defendant's vehicle and observed in plain view a police call scanner, as well as narcotic paraphernalia, including two small vials such as frequently contain various narcotics. Officer Brooks concluded that the paraphernalia was a "hype" kit and that the vials and bottles contained controlled substances. Brooks took the keys to the vehicle from defendant and opened the car's trunk. There he observed a large scanner for picking up police calls and the brown briefcase. There were also two other bags in the trunk, together with a raincoat, two other hats, four or five halloween-type masks with tape over the eyeholes, and a scanner company manual entitled "Police Frequencies." Officer Brooks opened the briefcase and the other bags. Upon opening the briefcase he discovered a bag similar to a shaving kit which was unzipped and contained a gun. Another gun, ammunition, a holster, a sap, handcuffs, gloves, a flashlight, and a bandanna were found in the briefcase itself. In the other bags he found a sledge hammer, miscellaneous clothes, and a brown cap.

## ISSUES

Defendant contends (1) the officers did not have probable cause to arrest him; (2) Officer Brooks did not have sufficient probable cause to conduct a warrantless search of the trunk of his car; and (3) the search of the briefcase without a warrant was illegal.[1]

---

[1] Although defendant also contends that defendant did not consent to the search of his vehicle and that the plain view observation of the narcotics paraphernalia did not justify the trunk search, we do not deal with these issues as they are conceded by the People.

## DISCUSSION

### I

 Contrary to defendant's contention, the evidence introduced at the section 1538.5 hearing amply supported the trial court's determination that probable cause existed for his arrest without a warrant. 
In a section 1538.5 hearing, the trial court sits as the trier of fact. It is the role of the reviewing court only to measure the facts, as found by the trier, against the constitutional standard of reasonableness. (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)
 Probable cause to arrest without a warrant is based upon the facts known to the officers at the time of the arrest. (*People v. Lara* (1967) 67 Cal.2d 365, 373-374 [62 Cal.Rptr. 586, 432 P.2d 202], cert. den., 392 U.S. 945 [20 L.Ed.2d 1407, 88 S.Ct. 2303].) The standard is whether "... a man of ordinary care and prudence would be led to believe and conscientiously entertain an honest and strong suspicion that the accused is guilty. [Citations.]" (*People v. Cockrell* (1965) 63 Cal.2d 659, 665 [47 Cal.Rptr. 788, 408 P.2d 116], cert. den., 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568].)

 McSeveney's belief that defendant may have been connected with the Nutel robbery was substantiated by information he obtained from the employees of the Nutel Motel.

As a result of information obtained by McSeveney's investigation and Carragher's identification of defendant, the police had reasonable cause to believe that defendant had participated in the Nutel robbery and probable cause to arrest him. Although defendant argues that there was a delay of over a month from the time the officers had probable cause to the time of defendant's arrest, he has presented no facts from which it can be concluded that the probable cause to seize him had become stale. The arrest without a warrant was not offensive to defendant's constitutional rights. (*United States v. Watson* (1976) 423 U.S. 411, 423-424 [46 L.Ed.2d 598, 96 S.Ct. 820].)

### II

 Defendant next contends that the search of the trunk of his car at the time of his arrest was invalid.

■ Searches conducted outside the judicial process are per se unreasonable, subject to a few specific exceptions. (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507].) It is the burden of the People to show that the search falls within one of those exceptions. (*People* v. *Minjares* (1979) 24 Cal.3d 410, 416 [153 Cal.Rptr. 224, 591 P.2d 514], cert. den., 444 U.S. 887 [62 L.Ed.2d 117, 100 S.Ct. 181].) ■ The warrantless search of the trunk of defendant's car in the case at bench was justified under the "automobile exception" to the warrant requirement. ■ This exception allows the police to conduct a warrantless search of an automobile where there is probable cause and exigent circumstances make it impracticable for the police to obtain a warrant. (*Chambers* v. *Maroney* (1970) 399 U.S. 42, 48-51 [26 L.Ed.2d 419, 426-428, 90 S.Ct. 1975].)

The automobile exception is applied where the seizing officer has probable cause to believe that the contents of the automobile offend against the law. (*Carroll* v. *United States* (1925) 267 U.S. 132, 155-156, 158-159 [69 L.Ed. 543, 552-553, 45 S.Ct. 280, 39 A.L.R. 790].) ■ This requirement is satisfied in the case at bench because the evidence disclosed that immediately prior to defendant's arrest the officers received a second tip from the original informant saying that defendant was planning another crime and had two handguns in his possession. Police are entitled to rely on such information when it is shown that both the informant and his information are reliable. (*Aguilar* v. *Texas* (1964) 378 U.S. 108, 114-115 [12 L.Ed.2d 723, 728-729, 84 S.Ct. 1509].) In the present case police were entitled to conclude that the *informant* was reliable because McSeveney had by independent investigation established that his first tip to the police was true. Furthermore, the informant's *information* was shown to be reliable because it was corroborated by other facts, sources, or circumstances. (*People* v. *Lara, supra,* 67 Cal.2d 365, 374-375.) The presence of the defendant at the rendezvous location at the correct time, the fact that he was seen taking the brown briefcase out of the trunk and later returning it to the trunk, and the fact that it appeared defendant planned to commit a crime in Santa Barbara because he was apprehended driving out of Los Angeles County westbound all corroborated the tip in its essential facts. Independent corroboration occurred through the officers' observation of defendant's suspicious behavior—continuous surveying of the street while he was removing and carrying the briefcase and again when he returned it to the trunk of his car. Such corroboration provided the officers with reasonable grounds to believe that the informant was telling the truth

and probable cause for the police to believe that the attaché case in the trunk contained a gun.

Defendant argues, however, that there were no exigent circumstances in this case (*Chambers* v. *Maroney, supra,* 399 U.S. 42, 51 [26 L.Ed.2d 419, 428]) because the car was at the time of the search within the exclusive control of the police. ▉ Nonetheless, due to the inherent mobility of the automobile, various automobile searches have been upheld where no immediate danger was presented. (*South Dakota* v. *Opperman* (1976) 428 U.S. 364, 367 [49 L.Ed.2d 1000, 1004, 96 S.Ct. 3092].) If the police have to take the time to get a warrant to search every car on the highway, they run the risk that the vehicle may be moved out of the locality or the evidence destroyed. (*Carroll* v. *United States, supra,* 267 U.S. 132, 153 [69 L.Ed. 543, 551].) The fact that the occupants of the automobile have already been arrested does not negate the exigent circumstance. (See *Chambers* v. *Maroney, supra,* 399 U.S. 42, 44, 52 [26 L.Ed.2d 419, 424, 428-429].)

▉ Despite defendant's arrest, his car was still a fleeting target, it was on an open highway, and there was a possible confederate waiting to remove the evidence. (See *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 460 [29 L.Ed.2d 564, 579, 91 S.Ct. 2022].) There had been no earlier opportunity to gain a warrant because the car had been under constant police surveillance; and now that it was seized, there was no constitutional difference between searching it or holding it until a warrant could be obtained. (*Chambers* v. *Maroney, supra,* 399 U.S. 42, 52 [26 L.Ed.2d 419, 428].) Consequently, the search of the trunk of the car without a warrant was valid under the automobile exception.

### III

▉ Defendant's final contention is that the officers illegally searched the briefcase. This was also the issue which defendant presented to the United States Supreme Court. After reviewing *Robbins* v. *California* (1981) 453 U.S. 420 [69 L.Ed.2d 744, 101 S.Ct. 2841], we conclude that the search of defendant's briefcase was illegal.

Noting the proliferation of litigation revolving around the principles limiting the search incident to a lawful arrest, the Supreme Court in *New York* v. *Belton* (1981) 453 U.S. 454 [69 L.Ed.2d 768, 101 S.Ct. 2860] took note of criticisms which have been leveled concerning sophisticated rules which must be followed by police in their day-to-day

work. The court noted the importance of establishing a single familiar standard which could guide police officers in the pursuit of their duties. Noting that no such rule has emerged from the litigated cases respecting the question of the search of an automobile, the court in *Belton* held that when there has been a lawful arrest of an occupant of an automobile, the officer or officers may, contemporaneously with that arrest, search the passenger compartment of the automobile. The court further held that upon making such a search, the police may also examine the contents of any containers found within the passenger compartment. The court stated, "Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." (*Id.*, at p. 461 [69 L.Ed.2d at p. 775].)

That the Supreme Court did not include in its new rule a provision for searching the trunk of an automobile or a container within the trunk 453 U.S. 420, is made abundantly clear by the fact that *Robbins* v. *California, supra*, was decided the same day as *Belton*. *Robbins* involved the search of the "trunk" of a station wagon. Actually, because of the construction of the vehicle, the area in question was a recessed luggage compartment reached after opening the tailgate of the station wagon. This search was instituted after highway patrol officers had stopped petitioner's car after observing erratic driving. After Robbins had alighted from his vehicle, the officers in patting him down discovered a vial of liquid. They also smelled marijuana smoke coming from the automobile, searched the passenger compartment, and found marijuana, as well as paraphernalia for using it. At that point Robbins was arrested, and, searching the luggage compartment, the officers found a tote bag and two packages wrapped in green opaque plastic. Opening the packages, they discovered blocks of marijuana.

After affirmance of Robbins' conviction by the Court of Appeal, the Supreme Court granted a writ of certiorari, vacated the Court of Appeal's judgment, and remanded the case for further consideration in light of *Arkansas* v. *Sanders* (1979) 442 U.S. 753 [61 L.Ed.2d 235, 99 S.Ct. 2586]. On remand, the Court of Appeal again affirmed, holding that the trial court "... could reasonably [have] conclude[d] that the contents of the packages could have been inferred from their outward appearance, so that appellant could not have held a reasonable expectation of privacy with respect to the contents." (*People* v. *Robbins* (1980) 103 Cal.App.3d 34, 40 [162 Cal.Rptr. 780].)

The Supreme Court again granted certiorari "Because of continuing uncertainty as to whether closed containers found during a lawful warrantless search of an automobile may themselves be searched without a warrant...." (*Robbins* v. *California, supra,* 453 U.S. 420, 423 [69 L. Ed.2d 744, 748].) The lead opinion in *Robbins* was delivered by Justice Stewart and three justices concurred therein. A fifth justice, Justice Powell, concurred in the judgment with opinion. The Chief Justice concurred in the judgment.

The opinion by Justice Stewart rejected the contention that the "automobile exception" (*Carroll* v. *United States, supra,* 267 U.S. 132) warranted the search of the green plastic bag. The opinion pointed out that it had been determined in *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476] that the automobile exception is confined to special, possibly unique circumstances which were the occasion of the rule's genesis. *Chadwick* held that although cars and luggage might both be characterized as being mobile, luggage itself is subject to being taken and kept under the control of the police. Also, the inherent mobility of an automobile is not the only justification for the automobile exception, since warrantless searches have been approved by the court even in cases where the automobile's mobility was irrelevant. The other factor giving rise to the automobile exception is the "... diminished expectation of privacy which surrounds the automobile," (*id.,* at p. 12 [53 L.Ed.2d at p. 549]) which arises from the fact that a car is used for transportation and not as a residence or repository of personal effects; that a car's occupants and contents travel in plain view; and that automobiles are necessarily highly regulated by government. (*Id.,* at pp. 12-13 [53 L.Ed.2d at pp. 548-549].) The opinion of Justice Stewart in *Robbins* then held that there is not any diminished expectation of privacy regarding luggage and that "... on the contrary, luggage typically is a repository of personal effects, the contents of closed pieces of luggage are hidden from view, and luggage is not generally subject to state regulation." (*Robbins* v. *California, supra,* 453 U.S. 420, 425 [69 L.Ed.2d 744, 749].) The court rejected the argument that the contents of a closed container which is placed in a vehicle are not fully protected by the Fourth Amendment. Justice Stewart pointed out that the Fourth Amendment protects people and their effects, and it makes no difference whether the effects are "personal" or "impersonal." The criterion used to render the contents immune from a warrantless search is the type of container, and, if the container is closed and opaque, there is manifested thereby an expectation that the contents will be secure from examination. The court stated, "Once placed within such a container, a

diary and a dishpan are equally protected by the Fourth Amendment." (*Id.*, at p. 426 [69 L.Ed.2d at p. 751].) The opinion noted that the fact that some containers by their very nature disclose their contents or at least create an inference thereof from their outward appearances is the kind of exception which proves the rule.

The court in *Robbins*, as it did in *Belton, supra*, 453 U.S. 454, expressed a desire to establish a rule which would be easy to apply and not riddled with exceptions. As the opinion was signed only by a plurality, it apparently did not succeed in establishing such a rule. Nevertheless, the holding is not to be disregarded as is suggested by the Attorney General. Justice Powell in his opinion specifically agreed that the situation in *Robbins* must be distinguished from *Belton* because in *Belton* the court established a "bright line" rule which permits the interior or passenger compartment of a vehicle and containers found therein to be searched without a warrant where there has been an arrest of the occupant of the vehicle. Insofar as the plurality opinion in *Robbins* establishes a new "bright line" rule, Justice Powell would not join because he couldn't assume that the police had probable cause to search the whole automobile as the plurality did. Justice Powell maintained that *Robbins* was a "container case." However, he noted that both *Chadwick, supra*, 433 U.S. 1, and *Sanders, supra*, 442 U.S. 753, require a warrant to search a container when it is either one that generally is used for personal effects or is sealed in such a manner as to manifest an expectation of privacy. Justice Powell wrote, "I nevertheless concur in the judgment because the manner in which the package at issue was carefully wrapped and sealed evidenced petitioner's expectation of privacy in its contents." (*Robbins* v. *California, supra*, 453 U.S. 420, 429 [69 L.Ed.2d 744, 752].)

If a package wrapped in green opaque plastic material may not be opened without a warrant even if it is found during the course of the lawful search of an automobile, then, a fortiori, a briefcase, such as we have in the instant case, may not be opened even though found during the course of the lawful search of an automobile. It can scarcely be argued that a briefcase is not generally "a repository of personal effects."

Assuming, arguendo, that Justice Powell distinguished *Robbins* from *Belton* because *Robbins* was a "container case" rather than an "automobile case" and that thus we are not bound by *Robbins* because the case at bench is an "automobile case," we are nevertheless governed by the holding in *People* v. *Minjares, supra*, 24 Cal.3d 410.

In *Minjares* the police stopped a car because of information linking the car and its occupant to a robbery. After arresting the driver and searching the passenger compartment, the police opened the trunk and found a tote bag, which they searched. The court held that under *Chadwick* v. *United States, supra*, 433 U.S. 1, the search was illegal. "The principles underlying *Chadwick*—and the Fourth Amendment—are not altered because the luggage in this case was found in the course of a search of an automobile. . . . '[t]he word "automobile" is not a talisman in whose presence the Fourth Amendment fades away and disappears.' [Citation.]" (*People* v. *Minjares, supra*, 24 Cal.3d 410; 420.) The facts in *Minjares* cannot be distinguished from the case at bench.

There are, of course, exceptions which would permit the arresting officers to search a container such as the briefcase herein; however, it is not argued that the opening of this briefcase was incident to a lawful arrest. (See *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].)

The People do, however, argue, and our dissenting colleague agrees, that in this case the search was justified by exigent circumstances (*Arkansas* v. *Sanders, supra*, 442 U.S. 753.) Recognizing, of course, that the doctrine of exigent circumstances is well established and well reasoned, we are unable to discern any such circumstances in this case. The briefcase in question was hardly within the "immediate control" of the respondent at the time of the search. ▉ Although footnote 11 in *Arkansas* v. *Sanders, supra*, 442 U.S. 753, 763-764 [61 L.Ed.2d 235, 245], states that exigencies will depend upon the probable contents of the luggage, this should not be taken as meaning that mere prior knowledge of the probable nature of such contents will justify the search. In both *Sanders* and *Chadwick, supra*, 433 U.S. 1, the officers had prior information concerning the contents of the containers therein involved. It is only when the officers have knowledge of the probable contents *and* probable cause to believe that the contents of the container are in and of themselves inherently dangerous that the need to obtain a warrant is dissipated. ▉ The briefcase had been reduced to the exclusive custody of the police, and there were no grave circumstances justifying the officer in substituting his judgment for that of a magistrate in determining the existence of probable cause for the search. The exigent circumstances justifying the search of the trunk were eliminated once the trunk was opened and the contents were reduced to the possession of the police. (*People* v. *Minjares, supra*, 24 Cal.3d 410.)

Finally, the People suggest (and our learned dissenting colleague seems to accept) that the warrantless search may be justified on the theory of an "accelerated booking search." In *People* v. *Bullwinkle* (1980) 105 Cal.App.3d 82 [164 Cal.Rptr. 163], the court justified the search of the arrestee's purse when the arrestee took it with her to the police station after having been arrested. After arriving at the police department, the officers searched the purse and discovered incriminating evidence. The *Bullwinkle* court held that a person who is under arrest and subject to being booked into jail must yield to a search of his or her personal effects. The court correctly held that booking searches traditionally extend to a purse. The court noted, "[P]urses and wallets are entirely different from automobiles. The contents of automobiles 'may be readily and adequately protected by locking the vehicle.' [Citation.] The contents of purses and wallets, on the other hand, are easily susceptible to theft since purses and wallets cannot normally be locked. [Citation.]" (*Id.*, at p. 89.) There was absolutely no necessity to search the briefcase in the case at bench during the booking of the defendant. On the contrary, the briefcase itself could have been secured while awaiting a decision by a magistrate as to whether to issue a warrant. "Once a closed container comes under an officer's exclusive authority, an immediate search is no longer necessary. Thus probable cause to believe the item contains contraband or evidence of a crime can support at most the seizure of the item; but a warrant must be obtained for its search. [Citations.]" (*People* v. *Minjares, supra,* 24 Cal.3d 410, 423, fn. omitted.)

Our dissenting colleague also opines that the search herein should be justified on the basis of inevitable discovery. ■ The inevitable discovery doctrine enunciated so cogently in *People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665 [145 Cal.Rptr. 795], is but a corollary of the "poison fruit" doctrine, i.e.: The constitutional compulsion to exclude evidence discovered as a result of official misconduct is logically limited to such evidence as would not have been discovered in the ordinary course of investigatory events. ■ To now stretch the doctrine of inevitable discovery to the point where a warrantless search can be justified on the ground that a search warrant would have been "inevitably" issued had it been sought is not only sophistry, but would constitute a practical repeal of the Fourth Amendment. Such reasoning requires a retroactive evaluation of a nonexistent affidavit presented to an imaginary magistrate, all of which must then be reviewed at a subsequent hearing by employing mere speculation.

Although we do agree that given the facts in the case at bench, the officers almost certainly would have been provided a warrant had they bothered to apply for such, this fact cannot be considered as justification for not making the effort to obtain the warrant. (*United States* v. *Chadwick, supra*, 433 U.S. 1, 15 [53 L.Ed.2d 538, 550-551].)

The order denying the motion to suppress the evidence of the contents of the briefcase is reversed. The matter is remanded. The court is directed to enter its order suppressing the evidence discovered from the search of the briefcase. The judgment of conviction is reversed. A new trial is ordered.

Spencer, P. J., concurred.

HANSON (Thaxton), J.—I respectfully dissent.

In order to make the discussion portion of this dissent more meaningful, I feel it is necessary, although somewhat repetitious of the majority opinion, to retrace in more detail the procedural history. Also in order to breath a little life and realism into an otherwise sterile case, an expansion of the factual background is deemed warranted.

PROCEDURAL HISTORY

On February 2, 1979, by way of a two-count information defendant Ruggles was charged with the robbery of John Carragher on July 24, 1978, using a 9 millimeter automatic pistol (count I) and with possession of a firearm by an ex-felon on January 3, 1979, in violation of Penal Code section 12021.[1]

An amendment to the information alleges that defendant Ruggles suffered six prior felony convictions for which he served time in state prison, namely: (1) and (2) convicted of conspiracy and robbery in the first degree, felonies, in the County of Los Angeles, State of California, on May 16, 1962; (3) convicted of robbery in the first degree, a felony, in the County of Los Angeles, State of California, on April 3, 1969; (4) convicted of robbery in the first degree, a felony, in the County of Santa Clara, State of California on April 3, 1969; (5) convicted of the crime of escape from custody, a felony, in the County of Santa Clara, State of California, in violation of section 4532b on October 3, 1969;

---

[1]Unless otherwise indicated, all statutory references are to the Penal Code.

and (6) convicted of assault with a deadly weapon, a felony, in violation of section 245. Each of the foregoing priors alleges that in each of the above listed felonies that he committed an offense resulting in a felony conviction during a five-year period subsequent to the conclusion of said term within the meaning of section 667.5, subdivision (b).

On February 5, 1979, defendant with court-appointed counsel pleaded not guilty as charged.

On February 27, 1979, defendant denied the alleged six prior felony convictions and made a motion to suppress evidence pursuant to section 1538.5. The People moved to have the instant case (No. A347889) consolidated with case number A348227.[2]

On March 29, 1979, defendant's motion to suppress pursuant to section 1538.5 was heard and denied. The evidence consisted of pages 4 through 32 of the preliminary hearing transcript (to be considered by the court pursuant to stipulation of the parties) and the additional testimony of prosecution witnesses Robert G. McSweeney and Jerry Lee Brooks and the testimony of defendant Ruggles limited to the motion to suppress.

On the same date, following denial of defendant's motion to suppress evidence, and pursuant to a negotiated plea, defendant withdrew his not

---

[2]Pursuant to *California Rules of Court*, rule 12(a), I augmented the record by ordering up the superior court file on case No. A348227 for review.

In this case defendant Ruggles was charged with robbery in violation of section 211 on November 30, 1978, and use of a handgun within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1).

The reporter's transcript of the preliminary hearing conducted on February 9, 1979, contains the testimony of the victim, Teresa Romero, who stated that on November 30, 1978, she was the manager of a 71-unit apartment complex in Glendale, California; that at about 12 o'clock noon two men came inquiring about renting an apartment; that one of the two men was defendant Ruggles; that defendant Ruggles who was the bigger of the two and wearing gloves pulled out a gun from his waistband; that the smaller man told her in Spanish he wanted money and told her to lie down on the floor; that when she refused, she was told to sit in a chair; defendant Ruggles took $150 deposit money kept in a box on the shelf behind the desk and then searched the premises; that they taped her into a chair; and that after the two men departed she freed herself and called the police.

Victim Romero stated that defendant Ruggles had long reddish brown hair and wore a moustache; that she identified defendant Ruggles from a series of photographs shown to her by the police at a later date and also at the time of the preliminary hearing made an in-court identification of defendant Ruggles as being the taller of the two men who robbed her on November 30, 1978.

guilty plea and pleaded guilty to count I (robbery), admitted the use allegation pursuant to section 12022.5 and admitted three of the six prior convictions.

Thereafter defendant Ruggles waived a probation report and requested immediate sentencing. He was sentenced to state prison for a total of nine years which could be served in any federal or state penal institution and said sentence to be served concurrently with any term the defendant may currently be serving.

On the People's motion, apparently in accordance with the plea bargain, the court, "in the interest of justice," dismissed count II of the instant case (No. A347889); dismissed three of the alleged priors which were not admitted; and dismissed the single robbery count in case No. A348227. (See fn. 2, *ante*.)

On April 11, 1979, defendant Ruggles filed his notice of appeal and appellate counsel was appointed at public expense.

On June 16, 1980, this court filed its opinion holding that defendant's section 1538.5 motion was properly denied and affirming the judgment of conviction.

On August 13, 1980, the California Supreme Court, in Bank, denied defendant Ruggles' petition for a hearing with Chief Justice Rose Bird voting to grant the petition.

On November 6, 1980, defendant filed a petition with the United States Supreme Court seeking to proceed in forma pauperis and for a writ of certiorari.

The sole question presented to the United States Supreme Court in defendant's petition for a writ of certiorari before that court was as follows: "Was the warrantless search of petitioner's briefcase, while it was under the exclusive control of the police, invalid thereby necessitating the granting of petitioner's motion to suppress?"

On July 2, 1981, the United States Supreme Court granted defendant Ruggles' petition for leave to proceed in forma pauperis and his petition for writ of certiorari. The clerk of the court advised this court that "[T]he judgment is vacated and the case is remanded to the Court

of Appeal of California, Second Appellate District, for further consideration in light of *Robbins* v. *California*, 453 U.S. 420 (1981)."

## FACTS

THE PRELIMINARY HEARING:

The testimony of John Carragher contained in the reporter's transcript of the preliminary hearing (pp. 4-32) conducted on January 18, 1979, and considered by the superior court at the section 1538.5 hearing on the motion to suppress pursuant to stipulation was substantially as follows:

Witness John Carragher testified that on July 24, 1978, while a manager of the Nutel Motel in Los Angeles he was robbed; that about two weeks prior to the robbery defendant Ruggles came to the motel and represented that he was a police officer with the Treasury Department and presented a badge; that the defendant said he was on "a narcotic bust" involving room 122 and wanted some information; that it was not unusual for police to come seeking information with problems involving the motel and he (Carragher) cooperated with defendant; and that this first contact with the defendant lasted about ten minutes.

Victim Carragher further testified that on July 24, 1978, defendant Ruggles reappeared at the motel. Debbie Doan, the PBX operator, called to Carragher who was in his office and said "this police officer is out here to see you." Mr. Carragher said to "come right in" whereupon two men entered his office, the taller of the two being defendant Ruggles whom he had talked to several weeks before and represented himself as a police officer; that after the two men were in his office the defendant said he had brought some photographs which he (defendant Ruggles) had referred to during his previous visit; that Ruggles introduced him to his partner and as Carragher reached out to shake his hand defendant Ruggles pulled an automatic pistol out of his coat and said: "If you don't keep quiet, I will blow your fucking head off"; that since it was after the holidays there was about four days' receipts amounting to approximately $5,000 in cash and checks on his desk; that defendant Ruggles ordered him to open the safe and defendant took a bank, some bills and an envelope containing Japanese yen and money orders; that Carragher was handcuffed with his hands behind his back and told to get on the floor on his knees where his legs were tied and Ruggles' partner stuffed cotton in his mouth and sealed it with tape; that the robbers were in his office a total of about ten minutes and

when they left they put his coat over his head and told him not to make any noise for at least ten minutes.

Witness Carragher made a tentative identification of Ruggles from a series of mug shots as the person who posed as a police officer and robbed him on July 24, 1978. The witness also identified defendant Ruggles in a subsequent lineup and from the defendant's passport photograph. The person who was with defendant Ruggles was a Latin of stocky build and much shorter than Ruggles with a pock-marked face.

THE MOTION TO SUPPRESS HEARING:

Police officers Robert G. McSeveney and Jerry Lee Brooks and defendant Ruggles were the only witnesses to testify at defendant's motion to suppress evidence pursuant to section 1538.5 on March 29, 1979. Their testimony is substantially as follows:

Witness Robert G. McSeveney, assigned to the robbery-homicide division of the Los Angeles Police Department with 24 years experience, testified that in the latter part of November 1978 he received information from Sergeant Morosky of the intelligence division that Sergeant Morosky had received information from an informant that defendant Ruggles, a parolee who had been in prison for armed robbery, was living in the San Pedro area of Los Angeles at 566 West 7th Street, was driving a black over red Mercury Montego and was pulling robberies in the Los Angeles area and that Ruggles had been involved in a motel robbery in Los Angeles accompanied by a male Latin and had used a blue steel automatic and handcuffs in the commission of the robbery.

Officer McSeveney testified that based upon the information from Sergeant Morosky he checked with the records division and came up with a "David Wendell Ruggles who had been arrested and had been in prison for robbery, had been paroled to the County of Los Angeles." The records disclosed a description of Ruggles as "a male, Caucasian, approximately 38 or 39 years old, he was over six feet tall, weighed over 200 pounds, and had reddish hair." Officer McSeveney then pulled what is called "a police package" which showed "a series of arrests and the nature of the crimes which Ruggles had been processed for in the past." Having been advised by Sergeant Morosky that the informant had said Ruggles had been involved in a motel robbery, Officer McSeveney checked police records for current outstanding robberies in the

Los Angeles area including all hotel-motel robberies with Caucasian suspects and came up with the Nutel Motel on West 3d Street.

Officer McSeveney also talked to other local law enforcement officers concerning incidents defendant Ruggles had been involved in in Los Angeles and talked to investigators in other jurisdictions. He was advised that defendant Ruggles two or three times prior to the Nutel Motel robbery had posed as a state narcotics officer and showed a badge; that in the City of Orange during an aborted robbery attempt in a restaurant in which defendant was shot, he (Ruggles) posed as a law enforcement officer from the Treasury Department checking out possible counterfeit money.

Thereafter Officer McSeveney obtained a booking photograph of Ruggles from prior arrests and convictions and driver's license photograph and prepared a photo lineup card which included Ruggles' photograph which he took to the Nutel Motel. There Carragher identified Ruggles and at that time the officer believed he had probable cause to arrest Ruggles for the robbery of the motel.

The officers did not arrest defendant Ruggles immediately because they were still attempting to identify the second suspect in the robbery. The information collected on Ruggles was given to the surveillance unit which had a helicopter surveillance on his San Pedro residence in an effort "to identify the second suspect or the person that he was running with at the time."

On January 2, 1979, Officer McSeveney and his partner Sergeant Stein were informed by Sergeant Morosky of intelligence that the same informant said Ruggles "was going to pull a major robbery, probably the following day" (Jan. 3, 1979). The informant indicated there were to be two people on the robbery and he was to pick up the second suspect near Reseda Boulevard and the Ventura Freeway and to rob a jewelry store in Santa Barbara. Officer McSeveney stated that the information from the informant was "that there would be two handguns used, one being a blue steel automatic. He also indicated that Mr. Ruggles normally would carry one of the weapons in the small of his back, and that he would probably have the second weapon in a briefcase or satchel with him." The information also was to the effect that Ruggles was armed and dangerous and was involved in two shoot-outs—one in Orange County and one in Beverly Hills.

The foregoing information was communicated to the surveillance team who were to conduct surveillance the following morning (Jan. 3, 1979) with instructions that if Ruggles was leaving the County of Los Angeles he was to be stopped and arrested. Officer McSeveney was not present when defendant Ruggles was arrested.

Witness Jerry Lee Brooks, who had 18 years experience with the special investigation section of the detective investigative support division of the Los Angeles Police Department, was with the team surveilling defendant Ruggles on the morning of January 3, 1979.

Officer Brooks testified that before starting the surveillance other officers gave him a description of the defendant, the vehicle he would be driving with the license number and told him that defendant Ruggles had a prior criminal record and had probably been involved in numerous robberies in the Los Angeles County area and previously was involved in a specific motel or hotel robbery. Officer Brooks stated that he was told "That he usually carried two handguns, one being carried in the small of his back area, and the other, usually carried in a brown attache case. [¶] And when the second gun that he carried in the small of his back, when it was not there, was always carried in a brown attache case. [¶] That he and another individual or other individuals had been involved in these robberies, or several robberies. [¶] That he may be or was in the process or may be preparing to commit another robbery. [¶] And that he would be in the area of Reseda Boulevard and Ventura Freeway on that particular date, or thereabouts. [¶] I was also informed that if he should leave, or during this surveillance, if it appeared that he was attempting to leave the County of Los Angeles, that he should be taken into custody on robbery charges."

Officer Brooks further testified that at about 7 a.m. on January 3, 1979, in an unmarked police vehicle along with other police vehicles surveillance of defendant was set up in the vicinity of Reseda Boulevard and the Ventura Freeway in the San Fernando Valley; that he observed defendant Ruggles in the red Cougar with license number described drive northbound onto Reseda Boulevard from the Ventura Freeway off ramp; that he (Officer Brooks) followed the defendant and saw him make several turns on surface streets and then park at the curb.

Officer Brooks then observed "The defendant, who was the driver, exited the vehicle. And as he exited the vehicle, he continuously looked up and down the street, back and forth, from one side of the street to

the other, in all directions, . . ."; that "He then walked to the trunk area of the vehicle. And he was still looking around. He opened the trunk. He removed a brown attache case, closed the trunk, continued looking in different directions, walked southbound and into an apartment building complex which is located on the southeast corner of Reseda and whatever that street is"; that defendant was in the apartment complex for 10 to 15 minutes and he (Officer Brooks) saw "He exited the apartment building complex and walked towards the car, once again looking up and down the streets, or in different directions, went to the trunk of the vehicle, opened the trunk, placed the briefcase in—the same briefcase in the trunk of the vehicle, closed it, got into the vehicle, drove it off, westbound on Reseda to, I mean, westwound [*sic*] towards Reseda and then southbound on Reseda towards the freeway."

Officer Brooks further testified that he earlier had received information specifically in respect to the attache or briefcase. "That at least one of the guns that the defendant had was kept in that particular briefcase, and when he was not carrying the other gun that he usually carried in the small of his back, it was also in the briefcase."

Officer Brooks followed defendant who first stopped in a gas station for a few minutes and then continued south on Reseda Boulevard to the Ventura Freeway and made a right-hand turn onto the on ramp of the Ventura Freeway westbound; that when it appeared defendant Ruggles was going to leave Los Angeles County area, defendant's vehicle was stopped and he was placed under arrest.

Officer Brooks stated the defendant's vehicle was traveling in the number one (fast) lane of the freeway and a marked black and white police car with red lights on pulled up behind defendant's vehicle and it pulled into the center divider; that the following marked police vehicle pulled up behind defendant's vehicle followed by several other police vehicles pulled in behind the black and white while Officer Brooks pulled up in front of defendant's vehicle.

As soon as the defendant stopped, he immediately exited his vehicle and the officers ordered him to raise his hands and he complied. The defendant was then ordered to lay prone on the center divider area and he was patted down, handcuffed and informed he was under arrest; that the defendant was then stood up against a chainlink fence in the middle of the freeway center divider. Officer Brooks peered into defendant's

vehicle from the outside and stated that "In the backseat I could see, in plain view, what is commonly referred to as a hype kit or syringe and needle. And I believe there was [sic] two of them. But I could definitely see one complete syringe and needle. [¶] And there was two vials or little vials of some type, or the type that I have seen in the doctor's office, that contain various types of narcotics. Had a label on the outside. Small label. There was also a large liquid container with tinfoil around it laying on the backseat.... First thing I observed, or, back up a bit, when I peered into the vehicle, I observed a small hand-held scanner, commonly known as a scanner, which picks up police calls, in the front seat of the vehicle."

The officer testified he had four or five years experience in narcotics and formed the opinion "That the needle and syrine was—a needle and syringe, commonly known as hype kit, and the vials were vials that contained some type of liquid narcotics or tranquilizer. But it is the particular type of bottle not normally dispensed over the counter, like if you would buy it from a pharmacy. [¶] Q. Did you believe the items were controlled substance?, [¶] A. Yes."

Officer Brooks asked Ruggles if he could search the trunk. The defendant said: "Shit, I don't care. Go ahead." Officer Brooks went to defendant's car and looked in the ignition but the key wasn't there and Ruggles then either took it out of his pocket or was still holding it in his hands and opened the trunk.

When Officer Brooks opened the trunk, he observed "a large, approximately 18 inches by 11 inches by 3 or 4 inches, what is called a Bearcat scanner, which picks up police calls. It has a wide-range of different frequencies.... sitting right next to the brown briefcase." In addition, there was "The brown briefcase. There was another brown bag. I believe there was an overcoat. There was a change of clothes of some type. [¶] There were other items in the trunk of the vehicle. I can't recall which particular item was in the briefcase and which item was laying scattered about the trunk. But there were also masks, halloween-type masks with tape over the eyeholes, four or five of those. Handcuffs, a sap, a brown or stocking knit-type cap. Numerous other— on, there was a manual that is produced or put out by, I believe, one of the scanner companies that said, 'Police Frequencies,' which gave all the police frequencies that could be picked up on these particular scanners throughout the Southern California or local area."

Officer Brooks, who opened the tan briefcase assisted in preparing an itemized property report, stated that the briefcase contained "Both guns, the ammunition, the holster, sap, handcuffs, some of the gloves. There were quite a few gloves. Flashlight, a bandanna, I think the—I said handcuffs and a sap. [¶] Q. Those items were in the briefcase; is that correct? [¶] A. Yes."

Officer Brooks also opened two duffel type bags in the trunk besides the briefcase. In one bag "was a hammer, or about a three-foot sledge-type hammer, miscellaneous clothes in the one bag. There were three hats found in the car, or two hats and a knit cap.

Officer Brooks' removed the unlocked briefcase from the trunk and opened it by releasing "a couple of catches." One of the guns was in an unzipped shaving-type case.

Defendant Ruggles testified only as to the events surrounding his arrest. He stated that around 8 o'clock on January 3 he was driving westbound in the number one (fast) lane of the Ventura Freeway when a police car came up behind him with its red lights on; that he pulled into the center divider and stopped and got out and an officer with a shotgun said: "Put your hands in the air and lay on the ground"; that he (Ruggles) hesitated not more than two seconds and the officer said: "Or I'll blow your fucking head off"; that the officers rushed in and put his arms behind him; that an officer said: "It is lucky that you didn't make a move towards your coat"; that one officer said: "Can I look in your car?" and he (Ruggles) said: "Shit, you are going to do what you want to do anyway" and an officer yanked the keys from his hand. Defendant Ruggles denied that he gave the officers consent to go into the trunk of his car.

The parties having rested, argued and submitted the matter, the trial court denied defendant's motion to suppress finding that the officers had probable cause to arrest defendant Ruggles and therefore the right to stop his vehicle; that the narcotics paraphernalia inside the vehicle observed through the window was in plain view and subject to seizure; and that although defendant did not voluntarily consent to the search of the trunk since any such consent constituted a submission to the assertion of authority, the officers were nevertheless justified in searching the trunk and the briefcase and bags therein since there was a definite nexus between the information known to the police officers and the con-

tents thereof consisting of weapons and other possible instrumentalities of crime.

## DISCUSSION

I agree with the majority opinion (1) that the police officers had probable cause to arrest defendant Ruggles and (2) that they had probable cause to conduct a warrantless search of the trunk of his car.

However, I disagree with that portion of the majority opinion which concludes that a reversal is necessary because "the search [opening] of defendant's [unlatched] briefcase [at the scene of the lawful arrest] was illegal."

It should be noted that the case at bench was remanded to this court for further consideration in light of the *Robbins* decision.

The deputy attorney general representing the People argued that the establishment of the "bright line" rule in *Robbins* is without force as precedent citing *Eaton* v. *Price* (1960) 364 U.S. 263, 264 [4 L.Ed.2d 1708, 1709, 80 S.Ct. 405]; *North* v. *Superior Court* (1972) 8 Cal.3d 301, 380 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; *People* v. *McKinnon* (1972) 7 Cal.3d 899, 911 [103 Cal.Rptr. 897, 500 P.2d 1097]. He points to the fact that in *Robbins* the four justices forming the plurality of the court (Stewart, Brennan, White and Marshall, JJ.) expressly disagreed with Justice Powell while Justice Powell, who concurred in the judgment and filed an opinion, expressly disagreed with the plurality of the court on the requirement as to when a search warrant is necessary to search a closed container found in the trunk or storage area of a car. (See *People* v. *Robbins* (1981) 453 U.S. 420 at pp. 425-428, 433-434 [69 L.Ed.2d 744, at pp. 750-751, 755, 101 S.Ct. 2841].) Since Chief Justice Burger only concurred in the judgment while Justices Blackmun, Rehnquist and Stevens filed dissenting opinions, the issue raised by the plurality opinion in *Robbins* was in fact considered by an equally divided court, hence was not actually decided, and, therefore, "is without force as precedent." (*Eaton* v. *Price, supra*, 364 U.S. at p. 264 [4 L.Ed.2d at p. 1709]; *North* v. *Superior Court, supra*, 8 Cal.3d at p. 308; *People* v. *McKinnon, supra*, 7 Cal.3d at p. 911.)

The majority opinion in the case at bench apparently agrees that since the new "bright line" rule which was sought to be established by

Justice Stewart was signed by only a plurality, it did not succeed. However, the majority opinion argues that the plurality holding should not be disregarded because of the language in Justice Powell's separate opinion.

Irrespective of the precedential weight to be given to the plurality in *Robbins*,[3] in my opinion the case at bench is not only markedly factually distinguishable from *Robbins*, but the warrantless search of the briefcase was justified in view of the exigent circumstances confronting the officers at the scene of the arrest and was in any event justified under the recognized and accepted doctrine of inevitable discovery.

The factual distinctions between *Robbins* and the instant case are glaring. In *Robbins* the California Highway Patrol stopped defendant Robbins' station wagon because he was driving erratically. When Robbins opened the car door to get his registration, the officers smelled marijuana smoke. The officers in searching the passenger compartment found marijuana as well as equipment for using it. The officers opened the tailgate of the station wagon and located a handle set flush in the deck and lifted it to uncover a recessed luggage compartment where they discovered a tote bag and two packages wrapped in green opaque plastic. Upon unwrapping the packages, the police found that each contained 15 pounds of marijuana.

In the case at bench, unlike in *Robbins* where the officers stopped the defendant for operating his vehicle in an erratic manner, the officers stopped defendant Ruggles because they had probable cause to arrest him for the armed robbery of the Nutel Motel where he had posed as a law enforcement officer; was a parolee who had been convicted of numerous other armed robberies; and from a reliable informant had learned that he was on his way to rob a jewelry store in the Santa Barbara area and was leaving their jurisdiction.

It is of interest to note that the plurality opinion in *Robbins* disposed of the argument that the officers were justified in opening the marijuana packages because "any experienced observer could have inferred

---

[3]As a matter of interest it is noted that if defendant Ruggles' parole agent had accompanied the police officers to the scene of the arrest, the agent, having been fully informed, would have been fully justified in making the search of the briefcase merely because of the parolee status of the defendant. (See *People* v. *Natale* (1978) 77 Cal. App.3d 568, 574 [143 Cal.Rptr. 629].)

from the appearance of the packages that they contained bricks of marijuana" by pointing out that the testimony of one of the arresting officers was somewhat obscure in that he had never seen such packages before but had heard contraband was packaged that way. The plurality stated that such vague testimony certainly did not establish that marijuana is ordinarily "packaged this way."

Here, the officers' testimony was not vague or obscure. They had reliable information that defendant Ruggles, according to the testimony of Officers McSeveney and Brooks, would have two handguns; that he (Ruggles) normally carried one in the small of his back and the other in a brown briefcase with him and if the one was not carried in the small of his back it was carried in the attache case with the other one. The officers had observed Ruggles a short time before his arrest on the Ventura Freeway take a brown attache case, look around, enter an apartment building complex, return 10 to 15 minutes later, look around and put the brown attache case back in the trunk. The trial judge in denying defendant's motion to suppress the evidence found there was a definite nexus between the information known to the police and the contents consisting of weapons and other possible instrumentalities of crime.

The instant case does not require a reversal because the plurality's language in *Robbins* (453 U.S. at pp. 428-429 [69 L.Ed.2d at p. 752]) expressly acknowledges by implication that "the presence of any circumstances that would constitute a valid exception to this general Rule, . . ." is still cognizable even under *Robbins.*

(In our pre-*Robbins* Court of Appeal unpublished opinion filed June 16, 1980, unanimously concurred in by Hanson, J., Lillie, Acting P. J., and Radin, J.,* we held the existence of the exigent circumstances exception justified opening the briefcase and the opinion passed muster by the state Supreme Court since defendant's petition for a hearing before that court was denied.)

Officers may conduct a warrantless search provided the following two elements are satisfied: (1) exigent circumstances which render the obtaining of the warrant an impossible *or* impractical alternative *and* (2)

---

*Assigned by the Chairperson of the Judicial Council.

probable cause exists for the search. (*People* v. *Huff* (1978) 83 Cal. App.3d 549 [147 Cal.Rptr. 316].)

Here, there was probable cause for the search because the officers had knowledge that the probable contents of the brown attache case consisted of two handguns and probably other instrumentalities used in robberies already committed and being transported for use in a robbery of a jewelry store in Santa Barbara. While the briefcase may have been under the control of the police, the totality-of-the-circumstances includes the fact that the defendant was arrested in the center divider of a freeway with vehicles speeding by a few feet away at speeds in excess of 55 mph. This locale necessitated quick action by the officers to confirm the presence of the dangerous weapons and to secure them. By merely flipping a finger, the police unlatched the unlocked catches and confirmed the presence of two guns, ammunition, a sap, handcuffs, flashlight and gloves in the briefcase. I would hold that the totality-of-the-circumstances constituted exigent circumstances rendering the obtaining of a warrant an impractical alternative.

The majority opinion also relies on the California case of *People* v. *Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514], (Clark, J., dis.) as authority requiring a reversal. The *Minjares* case is factually distinguishable. In *Minjares* after the defendant was arrested, his vehicle was towed to a city-owned storage yard and there the officers picked the lock to gain entry. The *Minjares* court held that a warrant must be obtained for a search of a container found in the trunk *unless* exigent circumstances dictate an immediate search and suppressed the container's contents. By contrast, the officers in the case at bench lawfully gained access to the trunk area at the time they apprehended defendant on the freeway. In view of the fact that officers had reason to believe Ruggles' briefcase contained weapons, clearly the exigent circumstances existed that justified the police flipping open the catches on the unlocked briefcase when they stopped defendant. These circumstances satisfied *Robbins* and the result does not run afoul of the principle set forth in *Minjares*.

In any event I would hold the "doctrine of inevitable discovery" applies.

The "doctrine of inevitable discovery" is discussed at length in *People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665 [145 Cal.Rptr.

795], and is defined at page 673 as follows: "'Although typically any evidence obtained, even indirectly, through the illegal actions of police is inadmissible as "fruit of the poisonous tree," where the court finds that the challenged evidence would have been eventually secured through legal means regardless of the improper official conduct, the inevitable discovery exception allows the evidence to be admitted. The doctrine was developed to prevent unjustly granting criminals immunity from prosecution.' (Novikoff, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules* (1974) 74 Colum.L.Rev. 88; fns. omitted.)"

The recent consolidated cases of *People v. Bullwinkle* (1980) 105 Cal.App.3d 82 [164 Cal.Rptr. 163], point out that it is proper to search a defendant's purse in the course of booking defendant into the jail, stating at page 87: "It has long been the rule that the police may search the person and the effects of a prisoner who is to be booked into jail, in order to prevent the introduction of contraband or weapons into the jail and in order to account for and safeguard the property taken from the prisoner. (*United States v. Edwards* (1974) 415 U.S. 800, 804-805 & fn. 6, 807 [ . . . ]; *People v. Ross* (1967) 67 Cal.2d 64, 70 [ . . . ]; [revd. on other grounds *sub nom. Ross v. California* (1968) 391 U.S. 470 ( . . . )]; *People v. Maher* (1976) 17 Cal.3d 196, 200-201 [ . . . ]; *People v. Rogers* (1966) 241 Cal.App.2d 384, 389 [ . . . ]; *People v. Superior Court (Murray)* (1973) 30 Cal.App.3d 257, 263 [ . . . ]; *People v. Balassy* (1973) 30 Cal.App.3d 614, 623 [ . . . ]; *People v. Gilliam* (1974) 41 Cal.App.3d 181, 189 [ . . . ]; *People v. Remiro* (1979) 89 Cal.App.3d 809, 835 [ . . . ]; Pen. Code, § 1412; Gov. Code, § 26640.)

"Where it is shown that a suspect would have been jailed and thus subject to a booking search, the fact that a thorough search of the booking type occurs prior to the actual booking process does not render the search illegal, since no additional or greater intrusion on the privacy of the suspect is involved. (*People v. Barajas* (1978) 81 Cal.App.3d 999, 1008-1009 [ . . . ]; *People v. Flores* (1979) 100 Cal.App.3d 221, 229-230 [ . . . ]; see *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 208-209 [ . . . ]; *People v. Longwill* (1975) 14 Cal.3d 943, 948 [ . . . ]; *People v. Brown* (1979) 88 Cal.App.3d 283, 293 [ . . . ].)"

The court also stated at pages 88-89: "[T]he purposes of a booking search include not only to prevent contraband and weapons from entering the jail, but also to account for the valuables and other property of

the prisoner, which the police are mandated by statute to do. (Pen. Code, § 1412; Gov. Code, § 26640.)[4] . . ."

In my opinion, it would not be unreasonable police conduct to have taken the "closed" but unlocked briefcase along with the other loose items found both in the car compartment and in the trunk, such as the hype kit, syringe and needle, the vials, the small hand-held scanner, the Bearcat scanner, the Halloween-type masks with tape over the eyes and the two duffel bags, with the defendant to the police station for booking. If this had occurred, the contents of the briefcase would have inevitably been disclosed at the time of booking at the police station during inventory as required by law and which did not require a search warrant.

The majority asserts that application of the inevitable discovery doctrine is based on "sophistry, [and] would constitute a practical repeal of the Fourth Amendment." Not so. It is a well established doctrine recognized by the courts of this state and the United States Supreme Court.

The doctrine of inevitable discovery was relied upon by the panel of this court in its pre-*Robbins* opinion filed June 16, 1980, which passed muster by the state Supreme Court in that it denied defendant's petition for a hearing.

Moreover, the United States Supreme Court has not disapproved the "accelerated booking search" theory. *Bullwinkle v. California* filed Nov. 17, 1980) 449 U.S. 988 [66 L.Ed.2d 285, 101 S.Ct. 522], involved

---

[4]In a footnote at this point the court states: "'When money *or other property* is taken from a defendant, arrested upon a charge of a public offense, the officer taking it must at the time give duplicate receipts therefor, specifying particularly the amount of money or the kind of property taken; one of which receipts he must deliver to the defendant and the other of which he must forthwith file with the clerk of the court to which the depositions and statement are to be sent. When such property is taken by the police-officer of any incorporated city or town, he must deliver one of the receipts to the defendant, and one, with the property, at once to the clerk or other person in charge of the police-office in such city or town.'

"Government Code section 26640 provides: 'The sheriff shall take charge of, safely keep, and keep a correct account of, all money and valuables found on each prisoner when delivered at the county jail. Except when otherwise ordered by a court of competent jurisdiction, the sheriff shall pay such money or sums therefrom and deliver such valuables or portions thereof as the prisoner directs and shall pay and deliver all the remainder of his money and valuables to the prisoner or to his order upon his release from the jail or to his legal representative in case of his death or insanity.'" (Italics added.)

an appeal challenging the conclusion in *People* v. *Bullwinkle, supra,* 105 Cal.App.3d 82, that an "accelerated booking search" of a purse of a felony-arrestee is constitutional despite the United States Supreme Court holding in *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476]. The United States Supreme Court dismissed the appeal "for want of a substantial federal question." (See *Bullwinkle* v. *California, supra.*) Dismissal of appeals for want of a substantial federal question constitutes a decision "on the merits" under *Hicks* v. *Miranda* (1975) 422 U.S. 332, 344-345 [45 L.Ed.2d 223, 236, 95 S.Ct. 2281].

Finally, there is not one word in the Fourth Amendment about "illegal" police activity. The operative word is "unreasonable." Only "unreasonable" police activity is prohibited. Where police officers in the discharge of their official duties "insur[ing] domestic tranquility" act "reasonably" in conducting searches and seizures there is no Fourth Amendment prohibition.[5]

Reasonable minds may differ as to whether police conduct was reasonable or unreasonable under the totality-of-the-circumstances of any particular case. In view of the totality-of-the-circumstances of the instant case, as previously set forth, the police officers' conduct constituted good police work and was reasonably justified in all respects.

Hopefully, this case will wend its way back to the United States Supreme Court. In view of the retirement of Justice Stewart and the addition of a new member to the court, it may rethink the plurality position in *Robbins* and adopt the positions expressed by Justices Blackmun, Rehnquist and Stevens in their dissents. As Justice Rehnquist pointed out in his dissent in *Robbins,* "Not only has historical study 'suggested that in emphasizing the warrant requirement over the reasonableness of the search the Court has "stood the fourth amendment on its head" from a historical standpoint.' *Coolidge, supra,* at 492 (Harlan, J., concurring) (quoting T. Taylor, Two Studies in Constitutional Interpretation, 23-24 (1969)), but the Court has failed to appreciate the impact of its decisions, not mandated by the Fourth

---

[5]The Fourth Amendment provides, in pertinent part, "that the right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, ..." (Italics added.)

Amendment, on law enforcement. . . ." (*Robbins* v. *California, supra,* 453 U.S. 420, 438 [69 L.Ed.2d 744, 759, 101 S.Ct. 2841].)

I would affirm the judgment.

A petition for a rehearing was denied December 9, 1981. Hanson (Thaxton), J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied January 27, 1982. Richardson, J., was of the opinion that the petition should be granted.